United States Court of Appeals,

Eleventh Circuit.

No. 94-5083.

UNITED STATES of America, Plaintiff-Appellant, Cross-Appellee,

v.

CITY OF HIALEAH, Raul L. Martinez, Mayor (in his official capacity), Hialeah Personnel Board, et al., Defendants-Appellees,

Rafael Suau, Defendant-Appellee, Cross-Appellant.

May 7, 1998.

Appeals from the United States District Court for the Southern District of Florida. (No. 94-1140-CV-SH), Shelby Highsmith, Judge.

Before CARNES, Circuit Judge, and KRAVITCH and REAVLEY[*], Senior Circuit Judges.

CARNES, Circuit Judge:

The United States appeals the district court's refusal to approve part of a consent decree it negotiated with the City of Hialeah, Florida. The underlying lawsuit claims that the City discriminated against blacks in hiring firefighters and police officers in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Other parts of the consent decree have been approved and entered, and they are not in question. One such part requires the City to hire as police officers and firefighters thirty blacks from a pool of prior applicants who were qualified but had been denied employment. The part of the decree the district court refused to enter would have granted retroactive competitive seniority to those thirty new black employees.

---

[*]Honorable Thomas M. Reavley, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

The district court, while finding that the United States had established a prima facie case of discrimination, refused to approve the retroactive seniority remedy part of the proposed decree because of objections from the police and fire unions, and from a group of individual police officers including Rafael Suau (the "Suau objectors"). The court found that the retroactive seniority provision in the decree would violate contractual seniority rights of the incumbent employees, rights guaranteed to them in the unions' collective bargaining agreements with the City. It therefore refused to enter that part of the proposed consent decree over the objections of those whose legally enforceable seniority rights would be adversely affected.

The United States contends that the district court erred in refusing to enter the part of the decree granting the new black employees retroactive seniority rights. The Suau objectors' cross-appeal, contends that the district court erred in finding that the United States had made out a prima facie case of discrimination. We agree with the district court that the retroactive seniority part of the proposed consent decree would have diminished the seniority rights of incumbent employees, which are legally enforceable rights guaranteed to them by their collective bargaining agreements. Accordingly, we hold that the district court properly refused to approve that part of the proposed decree absent either the consent of the unions and the individual objectors, or a finding that the provision was necessary and appropriate to remedy discrimination proven during a trial at which all affected parties had an opportunity to participate. In light of that holding, we also conclude that the cross-appeal is moot.

## I. FACTUAL AND PROCEDURAL HISTORY

In February 1992, the Department of Justice began an investigation into the hiring practices of the police and fire departments of the City of Hialeah, Florida. As of August 1992, the Hialeah

2

workforce was approximately 17% black, but only 2% of Hialeah police officers and 1% of Hialeah firefighters were black. Only 25.2% of black applicants passed the entry-level police examination, while whites had a 61.9% passing rate. Furthermore, only 67.2% of black applicants passed the entry-level exam for the fire department, while 95.9% of white applicants passed that examination.

In May 1993, the Department of Justice told the City that its hiring practices violated Title VII. Specifically, the Department claimed that the number of blacks in the police and fire departments did not adequately reflect their presence in the workforce. The Department also contended that the City's entry-level examinations for these positions had an adverse impact on blacks and were not consistent with business necessity.

Between May 1993 and June 1994, the City and the Department of Justice negotiated a settlement agreement. No representatives of either the police or fire unions were included in any part of these negotiations. Under the terms of the settlement agreement, the City, while not admitting to any Title VII violations, agreed to: (1) establish a recruitment program aimed at increasing the number of black police and firefighters; (2) develop written entry-level examinations that are consistent with business necessity or that do not adversely impact blacks; and (3) provide individual relief to black applicants who had been denied positions in the past solely because of their test scores.

That individual relief was to be composed of three components: (1) a monetary settlement of $450,000 to be distributed among eligible claimants as back pay; (2) a commitment to provide priority employment in each department to fifteen blacks who had been denied employment solely because of test scores, meaning that each department would hire its next fifteen employees from the class of eligible claimants; and (3) each claimant hired under the priority employment provision

3

would receive remedial retroactive seniority dating from six months after his or her original application for employment. The settlement agreement terms were incorporated into a proposed consent decree.

After the Department of Justice and the City completed their settlement discussions, the Department filed, on behalf of the United States, a Title VII complaint against the City on June 7, 1994. On the same day, the City and the Department filed a joint motion requesting that the district court approve the proposed settlement agreement and enter the consent decree.

On June 29, 1994, the district court granted a motion by the United States to join as defendants the Dade County Police Benevolent Association (PBA) and the Hialeah Association of Firefighters, Local 1102 of the International Association of Firefighters, AFL-CIO (Local 1102). Those unions are the authorized collective bargaining units for Hialeah police officers and firefighters. The Department of Justice contended that the joinder of those two unions was necessary to insure that the relief provisions of the settlement agreement could be fully implemented. Neither union, however, had been allowed to participate in the formulation of the settlement agreement that the parties asked the district court to impose. Attorneys for Local 1102 had expressed interest in taking part in the negotiations two weeks before the Department of Justice filed its complaint; the Department, however, never invited either union to participate.

On August 11, 1994, the district court held a fairness hearing, at which time it allowed Raul Suau and approximately 200 other individual police officers to intervene. At the fairness hearing, the district court did not allow the Suau objectors to develop evidence that they claimed would contradict the statistical evidence that the Department of Justice used to build its prima facie case. Nor did the district court allow the Suau objectors to cross-examine the government's statistical

4

expert. However, the district court did allow the unions and the Suau objectors to present nonevidentiary objections to the provision granting retroactive competitive seniority to blacks hired pursuant to the settlement agreement. "Competitive seniority" determines the allocation of benefits for which employees must compete with one another, such as shift assignments, promotions, and transfers. In contrast, "benefit seniority" determines benefits such as vacation time, compensation levels, and pension benefits that depend solely on that employee's longevity. The unions and the Suau objectors had no quarrel with the benefit seniority provisions, which did not adversely affect them. They did object, however, to granting the new hires retroactive competitive seniority, which they contend violates the rights of incumbent police and firefighters under their collective bargaining agreements with the City.

In an order dated August 16, 1994, the district court found that the United States had established a prima facie case of discrimination in the City's hiring practices for the police and fire departments. The court also concluded that the proposed decree was narrowly tailored to remedy that past discrimination. Notwithstanding those findings, the court refused to approve the consent decree. The court explained that affording competitive seniority benefits to those hired under the settlement agreement would violate the contractual rights of firefighters and police already working for the City, and it would have an "unfair, adverse impact" on current police and fire department employees. The district court urged all of the parties to negotiate a workable substitute remedy that avoided the problems of the proposed agreement while allowing for immediate relief. The United States filed a notice of interlocutory appeal on October 13, 1994, and the Suau objectors filed a notice of cross-appeal shortly thereafter.

On December 9, 1994, the district court approved a partial settlement agreement and consent decree that resulted from the negotiations of all of the parties involved in this case. That decree, which is not being appealed, is materially identical to the proposed consent decree that the district court refused to approve earlier, in all but one respect: it leaves for litigation the question of whether retroactive competitive seniority should be imposed. Thus, the sole issue which remains for this appeal is whether the district court erred in concluding that it should refuse to enter without a trial the retroactive competitive seniority provisions of the proposed consent decree, over the objections of parties who would be adversely affected by those provisions.

## II. STANDARD OF REVIEW

Subject matter jurisdiction over this appeal is a legal issue which we address in the first instance. *See Stovall v. City of Cocoa,* 117 F.3d 1238, 1240 (11th Cir.1997).

Our review of a district court's refusal to approve a proposed settlement agreement and enter a consent decree depends upon the basis of the refusal. *See id.* The district court has the responsibility to insure that a consent decree is not "unlawful, unreasonable, or inequitable." *United States v. City of Alexandria,* 614 F.2d 1358, 1361 (5th Cir.1980). To the extent that the district court's refusal to approve the settlement agreement was based on its conclusion that the proposed agreement would violate the contractual rights of incumbent employees, this appeal presents a question of law that we review *de novo. See Stovall,* 117 F.3d at 1240; *United States v. City of Miami,* 664 F.2d 435, 451 n. 7 (Former 5th Cir.1981) (en banc)(Gee, J., concurring in part and dissenting in part) ("It is difficult to envision an issue more purely legal than that of whether one written agreement, the consent decree, conflicts with another written compact, the existing collective bargaining agreement.").

6

### III. DISCUSSION

### A. SUBJECT MATTER JURISDICTION OVER THE APPEAL

The unions and the Suau objectors contend that no jurisdictional basis exists for this interlocutory appeal. Normally, only final judgments are appealable. *See* 28 U.S.C. § 1291. One exception to this rule is 28 U.S.C. § 1292(a)(1), which permits this Court to review "[i]nterlocutory orders of the district courts ... refusing ... injunctions." The United States contends that this appeal falls within that exception.

Congress did not intend for the injunction exception to open the floodgates to piecemeal appeals. The Supreme Court has repeatedly cautioned that the "exception is a narrow one and is keyed to the "need to permit litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence.' " *Gardner v. Westinghouse Broadcasting Co.,* 437 U.S. 478, 480, 98 S.Ct. 2451, 2453, 57 L.Ed.2d 364 (1978) (quoting *Baltimore Contractors v. Bodinger,* 348 U.S. 176, 181, 75 S.Ct. 249, 252, 99 L.Ed. 233 (1955)).

In *Carson v. American Brands,* 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981), the Supreme Court held that an interlocutory order must meet two requirements to be appealable under 28 U.S.C. § 1292(a)(1). First, if the relief sought is not actually an injunction, then it must have the practical effect of an injunction. *See Carson,* 450 U.S. at 83-84, 101 S.Ct. at 996. Second, for an appeal to be proper under 28 U.S.C. § 1292(a)(1), the appellant must show that the interlocutory order of the district court "might have a serious, perhaps irreparable, consequence, and that the order can be effectually challenged only by immediate appeal." *Id.* at 84, 101 S.Ct. at 997 (internal quotation marks omitted); *see also Roberts v. St. Regis Paper Co.,* 653 F.2d 166, 170 (5th

7

Cir. Unit B Aug.1981) (noting that order is appealable under § 1292(a)(1) only if denial of appealability would result in irreparable harm).

The United States contends that notwithstanding *Carson* 's explicit mention of two prerequisites for jurisdiction, it effectively establishes a uniform rule that all orders refusing to enter consent decrees in Title VII cases are automatically appealable under § 1292(a)(1). A close examination of the two *Carson* prerequisites and their application to Title VII cases leads us to conclude that the United States is correct about that. Whenever a district court refuses to enter a Title VII consent decree, the plaintiffs can immediately appeal that order under 28 U.S.C. § 1292(a)(1) instead of waiting until after the district court has entered a final judgment in the case.

Several considerations convince us of this conclusion. For example, the Supreme Court has subsequently made a statement indicating that *Carson* makes all orders refusing to enter a consent decree in Title VII cases interlocutorily reviewable. In *Local No. 93 v. City of Cleveland,* 478 U.S. 501, 517, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (1986), the Court stated that it had held in *Carson* that "a District Court's order denying entry of a consent decree is appealable under 28 U.S.C. § 1292(a)(1)." *Accord City of Miami,* 664 F.2d at 442 (Rubin, J., concurring) ("[T]he Supreme Court recently noted that a court's refusal to approve a consent decree in a Title VII case is an appealable order...."). Even though that statement by the Supreme Court in *Local 93* was dictum, it is of considerable persuasive value, especially because it interprets the Court's own precedent. *See, e.g., Peterson v. BMI Refractories,* 124 F.3d 1386, 1392 n. 4 (11th Cir.1997)("[D]icta from the Supreme Court is not something to be lightly cast aside.").

Another reason for our holding flows directly from analysis of the two jurisdictional requirements that *Carson* announced. Every refusal to enter a Title VII consent decree will satisfy

8

both *Carson* requirements for interlocutory jurisdiction. First, such a denial will always have "the practical effect of refusing an injunction." *Carson,* 450 U.S. at 84, 101 S.Ct. at 996. A consent decree will always contain injunctive relief because, by definition, a consent decree obligates the defendant to "stop alleged illegal activity." *Black's Law Dictionary* 410 (6th ed.1991). For example, the proposed consent decree in this case would have the effect of an injunction, because it would obligate the City to hire a total of thirty black police and firefighters and would prevent the City from using its current written entry-level exams to fill future openings. An order refusing to enter a consent decree in a Title VII case, therefore, satisfies the first requirement for interlocutory jurisdiction under *Carson.*

Second, a district court's refusal to enter a Title VII consent decree can be " "effectually challenged' only by immediate appeal" because it "might have a "serious, perhaps irreparable, consequence.' " *Id.* at 84, 101 S.Ct. at 997. Title VII embodies a strong preference for voluntary settlement of employment discrimination cases. *See, e.g., Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974) ("Cooperation and voluntary compliance were selected as the preferred means for achieving [the goals of Title VII.]"). The *Carson* Court noted that because litigation might cause an essential party to withdraw its assent to the decree, denying interlocutory review might destroy the conditions that permitted compromise in the first place, which would be in contravention of the strong public policy favoring voluntary settlement of Title VII cases. *See Carson,* 450 U.S. at 87-88 & n. 13, 101 S.Ct. 998 & n. 13.

That the City is not the party most affected by the competitive seniority provision of the proposed decree complicates the question of whether the possibility that the City might later withdraw its consent creates an irreparable injury for the purposes of *Carson.* However, we need

9

not decide whether the possibility that the City might withdraw its consent alone creates an irreparable injury in this case. The Supreme Court's opinion in *Carson* identifies an additional source of irreparable injury which, when considered in conjunction with the strong policy in favor of settlement of Title VII cases, renders an order refusing to enter a Title VII consent decree interlocutorily appealable. The opinion indicates that postjudgment review of a refusal to enter a consent decree raises serious problems even when the parties to the agreement continue to support the decree. *See Carson,* 450 U.S. at 88 n. 14, 101 S.Ct. at 998 n. 14. One such problem is that the court reviewing a final judgment may be forced to choose between the relief upon which the parties had agreed and the relief ordered by the trial court. *See id.*

The Supreme Court explained in *Carson* that making that choice correctly would be difficult, because "delaying appellate review until after final judgment would adversely affect the court of appeals' ability fairly to evaluate the propriety of the district court's order." *Id.* If the trial court ultimately ordered relief that differed from that originally agreed to by the parties, the reviewing court might be less likely to view the provisions of the original proposal as favorably as it might otherwise have. Deferring review of an order refusing to enter a consent decree in a Title VII case will always create a risk of irreparable harm because, even when no risk exists that the parties' willingness to compromise will be disrupted, having to go through litigation poses a risk to the settlement of cases and to a fair evaluation of the original proposal in any post-trial appeal.

An order refusing to enter a Title VII consent decree, therefore, will always pose a risk of irreparable harm as *Carson* envisioned it. Consequently, whenever a district court refuses to enter

10

a consent decree in a Title VII case, that order is immediately appealable under 28 U.S.C. § 1292(a)(1). We therefore have jurisdiction over the government's appeal in this case.[1]

## B. REFUSAL OF THE DISTRICT COURT TO APPROVE THE CONSENT DECREE

### 1. *A Consent Decree Requires the Consent of All Parties Whose Legal Rights Will Be Affected By the Decree*

We turn now to the merits of the appeal. The United States contends that the objection of the unions and the Suau objectors to the remedial seniority part of the proposed decree is insufficient to prevent its entry. It is true that opposition to a proposed consent decree will not always operate as a bar to it. While a party "is entitled to present evidence and have its objections heard at the [fairness] hearings ..., it does not have the power to block [the] decree merely by withholding its consent." *See Local No. 93 v. City of Cleveland,* 478 U.S. 501, 529, 106 S.Ct. 3063, 3079, 92 L.Ed.2d 405 (1986). However, the objection of a party whose rights or claims would be adversely affected does bar a proposed consent decree. *See id.* ("parties who choose to resolve litigation through settlement may not dispose of the claims of a third party"). Our holdings in *United States v. City of Miami,* 664 F.2d 435 (Former 5th Cir.1981) (en banc), and *White v. Alabama,* 74 F.3d 1058 (11th Cir.1996), make it clear that a consent decree requires the consent of all parties whose legal rights would be adversely affected by the decree.

### a. The *City of Miami* Decision

---

[1]As indicated, our holding in this case is compelled by the reasoning and language in *Carson,* another Title VII case the decision of which was based in part upon the strong, congressionally indicated preference in favor of settling Title VII cases. *See Carson,* 450 U.S. at 88 n. 14, 101 S.Ct. at 998 n. 14 ("In enacting Title VII, Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims."); *see also Alexander,* 415 U.S. at 44, 94 S.Ct. at 1017 (1974). The question of whether a district court's order rejecting a proposed settlement agreement in a non-Title VII case is interlocutorily appealable is not before us, and we express no view on it.

11

Although the en banc decision of the former Fifth Circuit in *City of Miami* was released after the circuit split, it is part of the law that is binding upon subsequent panels in this circuit. *See White,* 74 F.3d at 1074 n. 50. In the *City of Miami* case, the en banc court vacated in relevant part a district court order approving a consent decree. The decree had provided that when a minority employee had the greatest seniority in a particular position and was qualified for a promotional opportunity, the city was required to promote that minority employee unless another applicant had demonstrably superior qualifications. *See City of Miami,* 664 F.2d at 446 (Rubin, J., concurring). That provision of the decree conflicted with the police officers' collective bargaining agreement, which guaranteed that promotions would be made on the basis of civil service examination scores. The police union (the FOP) objected to that part of the decree, arguing among other things, "the impropriety of enforcing the decree against the FOP without a trial between the City and the Attorney General." *Id.*

Accepting that argument, the en banc Court held: "A party potentially prejudiced by a decree has a right to a judicial determination of the merits of its objections." *Id.* at 447.[2] It explained that a "party is prejudiced if the decree would alter its contractual rights and depart from the governmental neutrality to racial and sexual differences that is the fundament of the Fourteenth

_____

[2] Even though Judge Rubin's concurring opinion in *City of Miami* was joined by only five of the twenty-four judges who participated in that decision, we quote from and cite it as the opinion of the Court. The reason we do so is, as the introductory per curiam opinion in that case explains, while there is no majority opinion, Judge Rubin's opinion is the narrowest basis for the Court's appellate judgment, and serves as its mandate. *See* 664 F.2d at 436 (per curiam).

Another opinion, authored by Judge Gee, and joined by a total of 11 judges would have granted even more relief to the objecting police officers and ordered a broader remand on their behalf. *See id.* Thus, a total of 16 of the 24 judges participating in *City of Miami* agreed that a trial cannot be dispensed with by a consent decree which would affect the contractual rights of an objecting party.

12

Amendment in order to redress past discrimination." *Id.* The rule is that "[t]hose who seek affirmative remedial goals that would adversely affect other parties must demonstrate the propriety of such relief." *Id.* Such a demonstration requires a trial on the merits (or a valid summary judgment, which was not even sought in this case), and it cannot be accomplished in a consent decree proceeding if the rights of a nonconsenting third party are affected. As the *City of Miami* opinion explained: "parts of the decree do affect the third party who did not consent to it, and these parts cannot properly be included in a valid consent decree." *Id.* at 442.

Those holdings from *City of Miami* would seem to dispose of the matter. However, the United States contends that the requisite "demonstration" of intentional discrimination need not be made in a trial of the merits to final judgment, and it is enough if a court finds that a prima facie case has been established. Even if we adopted that position we would not apply it in this case, because the district court did not give the Suau objectors a full opportunity to contest the existence of a prima facie case. The Suau objectors were not given permission to intervene until the date of the fairness hearing. As soon as the court granted their motion to intervene, they asked for the opportunity to develop and present evidence of their own, but that request was denied. They also asked to cross-examine the statistician whose affidavit the United States proffered to show a prima facie case. The Suau objectors stated that:

> if given an opportunity to question Dr. Thompson, then we would be able to establish that her area of expertise is not labor economics and that her, and that she lacks the ability as an expert to offer an opinion as to what the relevant labor market should be for determining that there is an under-representation within the relevant labor market.

The district court denied that request. The requirements of due process dictate that if the issue of whether a prima facie case exists is to be decisive, each party should be afforded a full and fair

13

opportunity to present evidence relevant to that issue and to contest evidence proffered by any other party. That did not happen in this case.

In any event, the facts of *City of Miami,* as well as the explicit holding of that decision, preclude any holding that a prima facie case is enough to justify dispensing with an objecting party's right to a full adjudication of its position on the merits in a trial. As to the facts in *City of Miami,* the United States and the City entered a stipulation which showed "gross statistical disparities presented in the workforce" concerning the number of blacks, Latins, and women compared to white males, and also a "striking disparity in earnings." *United States v. City of Miami,* 614 F.2d 1322, 1332, 1339 (5th Cir.1980). The panel opinion in that case noted that the FOP, the party objecting to entry of the consent decree, did not challenge those statistics. *See id.* at 1339. Likewise, the en banc opinion observed that while urging the district court to conduct a "full-blown trial," the FOP had "proffered no evidence and did not attempt to controvert in any way the stipulation between the United States and the City." 664 F.2d at 438-39. Furthermore, in that case the City admitted the requisite past discrimination. *See id.* at 443-44.

As the en banc opinion in *City of Miami* summarized it: "The United States and the City stipulated data that supported the inference of past discrimination, and they agreed to a statement in the text of the decree that the City had discriminated against blacks, Latins, and women." *Id.* at 444. The panel opinion in that case explicitly found that the stipulated statistics alone "present an overwhelming prima facie case of discriminatory employment practices." 614 F.2d at 1339. The en banc opinion did not disagree with that finding. Therefore, there was a prima facie showing of discrimination in *City of Miami.* If the existence of a prima facie case were enough to justify

14

abrogating an objecting party's rights via a so-called "consent decree," *City of Miami* would have been decided differently. Because it was not, we are bound to reject the United States' position.

Another insurmountable hurdle to the United States' attempt to surmount the en banc holding in *City of Miami* is the explicit language of that decision itself. In complex cases good opinions often state their holdings with careful specificity near the beginning and again at the end of the opinion. Judge Rubin's opinion in the *City of Miami* case does that. The first paragraph of his opinion for the en banc court consists of these three sentences:

> This case requires us to examine the circumstances under which, and the procedure by which, a court may enter a consent decree in a multiparty suit when some, but not all, of the litigants agree to the decree and parts, but not all, of the decree affect the rights of a nonconsenting party. *We conclude that* a decree disposing of some of the issues between some of the parties may be based on the consent of the parties who are affected by it but that, *to the extent the decree affects other parties or other issues, its validity must be tested by the same standards that are applicable in any other adversary proceeding.* Most parts of the decree entered by the trial court in this Title VII case pass the requisite muster, and we affirm them; however, *because a part of the decree, entered without a trial, affects the rights of an objecting party, we* limit its effect as to that party and *remand for trial of the complaint insofar as a remedy is sought against that party.*

664 F.2d at 436 (emphasis added).

The first sentence of that first paragraph of the *City of Miami* opinion states the issue in that case, which is identical to the issue in this case. The second sentence states the conclusion of the Court: to the extent a proposed consent decree affects the rights of nonconsenting parties, "its validity must be tested by the same standards that are applicable in any other adversary proceeding." In "any other adversary proceeding" a nonconsenting party's rights cannot be abrogated merely upon a showing of a prima facie case; that can be done only in a judgment entered following trial (or summary judgment). In order to remove any doubt, the third and last sentence of the opening paragraph unambiguously states that as to the objecting party, the case is "remand[ed] *for trial* of

15

the complaint insofar as a remedy is sought against that party." The opinion says "for trial," not for any proceeding short of trial. It certainly does not say that the remand was for the purpose of determining whether a prima facie case could be established. One already had been. More than a prima facie case is required by the *City of Miami* decision. The more that is required is a trial. The very first paragraph of the opinion could not have been clearer about that.

Likewise, the concluding three sentences of the *City of Miami* opinion, in a section labeled "Mandate," state:

> The case is remanded, in addition, for further proceedings, consistent with this opinion, to determine whether the United States has the right to claim any relief concerning police promotion. *If, at trial, the United States can prove* that the City has discriminated against black, Spanish-surnamed, or female police officers, or that the City has so discriminated in its employment policy as to prejudice their opportunities for promotion, and that affirmative action in favor of the affected class is appropriate remedial action, the United States may seek such relief, including reimposition of the contents of paragraph 5(c). The FOP shall, of course, be afforded the opportunity either to contend that discrimination, the necessary predicate for relief, has not been *proved,* or to show that the type of relief embodied in paragraph 5(c) is, in this instance, unnecessary, inadvisable, or unconstitutional.

*Id.* at 448 (emphasis added). The first sentence remands for further proceedings consistent with the opinion, and the second sentence explicitly states that those proceedings are to occur "at trial." Both the second and third sentences speak of what the United States is required to prove at that trial, not what it may simply suggest with a prima facie case. Thus, the explicit language of the concluding paragraph, as well as that of the opening paragraph, in the *City of Miami* opinion precludes interpreting that decision as permitting an objecting party's rights to be dispensed with upon nothing more than a prima facie showing of discrimination. Proof at trial is required.

b. The *White* Decision

This Court recently applied and followed the *City of Miami* rule in *White v. Alabama,* 74 F.3d 1058 (11th Cir.1996), a decision which vacated a district court's judgment approving and

16

incorporating a settlement agreement that would have altered the manner in which Alabama state judges were selected. The district court, finding that the original plaintiffs had established a prima facie case that the Voting Rights Act had been violated, entered what purported to be a "consent decree." That decree was consented to by the original plaintiffs, by the State Attorney General, and by the Department of Justice. *See id.* at 1073. But two intervening plaintiffs and an intervening defendant did not consent to entry of the decree; they objected to it. *See id.* at 1064-67, 1072-74. Nonetheless, the district court entered the decree without a trial, treating it as a consent decree. *See id.* at 1073 n. 48.

We were unequivocal in explaining why there could be no consent decree absent consent of all the parties whose rights would be affected:

> First, the district court's final judgment is not a consent decree. It is a final judgment, because it disposes of all of the claims and defenses of all of the parties in the case. See 28 U.S.C. § 1291; *Andrews v. United States,* 373 U.S. 334, 83 S.Ct. 1236, 10 L.Ed.2d 383 (1963). *But it is not a final consent decree, because not all of the parties consented to its entry.* White, the Attorney General, the Department of Justice, and the district court refer to the final judgment as a "consent decree." That, however, does not make it one.

*Id.* at 1073 (emphasis added). To ensure no one missed the point, in the very next paragraph we reiterated that: "In this circuit, a decree that provides a remedy agreed to some, but not all, of the parties cannot affect the rights of a dissenting party." *Id.* Of course, we cited for that proposition the *City of Miami* en banc decision. *See id.*

The dissenting opinion in this case attempts to perform reconstructive surgery on *White* by suggesting that it really does not mean, as it plainly said, that a consent decree requires the consent of all the parties whose rights are affected. Instead, the dissenting opinion contends, a decree entered by consent of some parties can modify or affect the rights of a dissenting party, so long as

17

the party getting shafted has not formally pleaded any claims, i.e., is not a plaintiff or third-party plaintiff.

Neither *White,* nor *City of Miami* which it cites, imply that parties who have pleaded claims are the only ones whose consent is necessary and whose legal rights matter. Indeed, in *White* one of the parties whose objection prevented entry of a consent decree was an intervening defendant who had not pleaded any claim; he just wanted to maintain the status quo. *See* 74 F.3d at 1075 n. 51. Nor does the dissenting opinion explain why a nonconsenting plaintiff's rights should be given more protection than a nonconsenting defendant's rights, or any other party's rights that were asserted in an objection instead of in a claim.

The dissenting opinion points to footnote 53 of the *White* opinion, which discussed *Local No. 93 v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). That discussion does not detract from the clear holding in *White* or support the position of the dissenting opinion. Instead, the discussion clearly recognizes that in *Local No. 93* the Supreme Court acknowledged that "had the settlement affected the union's rights, the decree could not have been entered without its consent." 74 F.3d at 1075 n. 53. The *City of Miami* decision also puts the focus on whether the rights of objecting parties would be affected by the decree. *See City of Miami,* 664 F.2d at 447 ("[t]hose who seek affirmative remedial goals *that would adversely affect other parties* must demonstrate the propriety of such relief") (emphasis added); *id.* at 436 ("to the extent the decree affects other parties"); *id.* ("because a part of the decree, entered without a trial, *affects the rights of an objecting party,* we ... remand for trial ....") (emphasis added). We follow the explicit holdings of *White* and *City of Miami.* Those holdings bind this Court as well as the district court, and they

18

forbid entry of a "consent decree" insofar as it adversely affects the legal rights of an objecting party, whether that party is a plaintiff or defendant.

### c. The *Local No. 93* and *Franks* Decisions

As a subsequent panel, we are bound by the *White* panel's interpretation of the Supreme Court's *Local No. 93* decision. *See, e.g., United States v. Hutchinson,* 75 F.3d 626, 627 (11th Cir.1996). That interpretation, which holds that to the degree a consent decree diminishes a party's legal rights, it cannot be entered over that party's objections, *see White,* 74 F.3d at 1075 n. 53, is inconsistent with the dissenting opinion's reading of *Local No. 93.* However, even if we were writing on a clean slate we would interpret *Local No. 93* the same way *White* did.

The express language of *Local No. 93* refutes the dissenting opinion's contention that, under the Supremacy Clause, contractual rights guaranteed by Florida law cannot prevent entry of a consent decree. That decision explicitly recognizes that a consent decree cannot dispose of the contractual rights of objecting parties. The *Local No. 93* Court affirmed entry of the consent decree in that case because "the consent decree does not purport to resolve any claims the Union might have ... as a matter of contract." 478 U.S. at 530, 106 S.Ct. at 3079. The union intervenor in *Local No. 93,* unlike the intervenors in this case, did not assert any legal rights that would be impinged by the consent decree. *See* 478 U.S. at 508-11, 106 S.Ct. at 3067-69. Apparently, no established collective bargaining rights were affected by the decree, because the union did not contend that any were.[3]

---

[3]The dissenting opinion contends that the Local No. 93 union asserted that the decree "would affect the contractual expectations of its members." The language of *Local No. 93,* however, does not support that contention. The most that Local No. 93 seems to have alleged is that "promotions should be made on the basis of demonstrated competency." *Local No. 93,* 478 U.S. at 507, 106 S.Ct. at 3067. Expectations aside, nothing in the opinion suggests that the union ever asserted that the decree would violate *contractual rights.* In fact, the Court commented that the union "failed to raise any substantive claims." *Id.* at 530, 106 S.Ct. at 3079.

19

As the Supreme Court pointed out in *Local No. 93,* the district court provided the objecting union with several opportunities to advance specific objections and to develop evidence to substantiate those objections; the court even informed the union that vague appeals to fairness could not prevent entry of the decree. *See id.* at 528-29, 106 S.Ct. at 3078-79. Instead of detailing specific claims as to how the decree would impair the rights of its members, the union merely protested that "there must be a more equitable, fair and just way to correct the problems caused by the [City]," and that it was totally opposed "to the use of racial quotas which must by their very nature cause serious racial polarization." *Id.* at 511, 106 S.Ct. at 3069. As the Supreme Court characterized it, the union simply "express[ed] its opinion as to the wisdom and necessity of the proposed consent decree." *Id.* That is entirely unlike *City of Miami* and this case, where the intervenors have objected based upon their specific legal rights under Florida law, rights that the decree would abrogate. See pp. 2599-2600, below.

Finally, the rule the dissenting opinion would read into *Local No. 93* not only cannot be found in the opinion in that case, it cannot withstand scrutiny either. According to the dissenting opinion, an objecting party's existing legal rights can be sacrificed to the interests of the other parties, without a trial, so long as the intrusion on those rights does not obligate that party "to do or not to do anything." That would mean, for example, that the other parties could agree to use a "consent decree" to cut the wages of the objecting union members, in violation of their contractual rights, if the other parties deemed it necessary and appropriate to do so in order to fund aspects of the remedy put into place by the decree. Under the rule advocated by the dissenting opinion, the union members whose wages were being cut over their vehement objection would not be entitled to bar the settlement or to insist upon a trial. What would matter is that they were not being ordered

20

to do anything by the decree. The City could take care of the paperwork and other affirmative acts necessary to actually reduce their compensation. Such are the implications of the dissenting opinion's interpretation of *Local No. 93,* which is an interpretation we are confident never occurred to the Supreme Court, and is also an interpretation foreclosed by *White.*

The dissenting opinion also relies heavily upon *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), which it says "stands for the proposition that a third party cannot block approval of a consent decree merely because the party will be "affected' by the decree." See dissenting op. at 2606. The reason *Franks* does not and cannot stand for that proposition is that *Franks* only involved remedy issues arising after a full blown trial at which the plaintiffs went further than merely showing a prima facie case and actually proved that the defendant corporation had engaged in a pattern of racially discriminatory practices. The word "consent" is not mentioned, not even once in the *Franks* opinion, because that decision had nothing at all to do with consent decrees. Nowhere does the dissenting opinion explain how *Franks,* which concerned the propriety of make-whole relief following a finding of discrimination in violation of Title VII, could possibly apply to this case, where the government conceded before the district court that no finding of discrimination had been made.

The dissenting opinion attempts to make more of *Local No. 93* and *Franks* than either will support by combining language from the Court's opinions in the two cases as though it were all from the same decision. *See* dissenting op. at 2608-09. That is like trying to produce a unicorn by crossing a mule with a rhinoceros. *Local No. 93* is not a consent decree case in which the objecting party articulated a specific contractual right that the decree would contravene. Neither is *Franks.* Those two decisions cannot be combined to produce what they are not. The issue before us is not

21

whether or when a third party's legal rights must give way in order to remedy a federal constitutional or statutory violation established in a trial. Instead, the issue is whether based upon the agreement of some other parties in the lawsuit a court can abrogate, violate, or impinge upon the legal rights of an objecting third party where the necessity or propriety of doing so has not been established in a trial or by summary judgment.

Our difference with the dissenting opinion on this important issue is evident in terminology. In the dissenting opinion, the original class of potential claimants is referred to as the "discriminatees" or the "actual victims of discrimination." That terminology assumes that a trial would reach that conclusion. However, at the fairness hearing, the government indicated that it was seeking only to establish a prima facie case of discrimination, and that it had no intention of proving its case at that time. The attorney for the government took the position that: "the district court does not need to find discrimination. This is not a litigated judgment." The district court then indicated that it would not make a finding of discrimination: "I agree with that." The court later added: "the trial judge ought not to try the case in the settlement hearings." Nothing in the record supports the dissenting opinion's assumption that the potential class of plaintiffs have been demonstrated to be "discriminatees" or "actual victims of discrimination." Of course, if the desired conclusion is assumed, it is a simple matter to reach that conclusion. For the same reasons we would not do so in other cases where summary judgment has not even been sought, we decline to assume there is no point in having a trial in this case.

We concede that the dissenting opinion's position, if taken to its logical conclusion, might be a promising way to ease judicial workloads. If we can dispense with the consent of the unions and the intervening employees and resolve this case over their objections, why should we not

22

dispense with the consent of the City as well?  Why not let the Department of Justice, once it has demonstrated a prima facie case, enter into a settlement agreement with itself (and perhaps with the original plaintiff class as well), and have the court enter a "consent" decree to that effect even if the City objects?  If the consent of the intervenors is not required before their legal rights can be settled away, why should the consent of the original defendant be required?  Fortunately, the holdings of the *City of Miami* and *White* decisions save us from such possibilities, because those decisions compel the conclusion that a proposed consent decree is due to be rejected if it would affect the legal rights of the objecting parties.  We turn now to that question in this case.

2. *The Proposed Consent Decree Would Adversely Affect Legal Rights of the Intervenors*

In this case, the police and firefighters' collective bargaining agreements confer legal rights that the proposed consent decree would affect adversely.  The dissenting opinion concludes that the decree at issue in this case is like the one that the Court approved in *Local No. 93* because both would affect future promotions.  However, that is where any similarity ends.  Unlike *Local No. 93,* the decree at issue in this case affects a wide range of contractual rights that existing collective bargaining agreements clearly guarantee incumbent employees. Examination of those rights dispels any superficial similarity that may result from a first glance comparison of *Local No. 93* and the present case.

Several of the rights that the Hialeah collective bargaining agreements detail accrue strictly according to seniority.  For example, the City retains no authority to decide which firefighters to call back for mandatory overtime.  Article 52, Section 2 of the Local 1102 agreement states that when additional firefighters are needed on duty and the positions cannot be filled with voluntary

23

replacements, they "shall be filled via mandatory overtime by the most junior available employee[s] of the appropriate rank."

The collective bargaining agreement also confers seniority rights involving some positions in the Fire Department, such as those on the hazardous materials team. Article 51, Section 1 of the agreement provides, "As positions open up on the hazardous materials team, they shall be filled from among personnel who have expressed an interest based on seniority in grade." Because allocation of such benefits is strictly according to seniority in rank, a grant of retroactive seniority to some individuals infringes other employees' accrued seniority rights.

Similarly, the Police Benevolent Association (PBA) bargaining agreement provides seniority rights relating to promotions. Article 1 of the PBA agreement defines seniority as "[t]hose rights which accrue to an employee based on longevity in the department...." Subsequent provisions describe the rights that seniority confers upon the police officers. Article 24 of the PBA agreement specifies that: "Eligible applicants for the promotional examination for Sergeant shall be entitled to one-fourth (1/4) of a point for each full year of service as a Hialeah Police Officer." The settlement agreement's grant of retroactive seniority to new hires would curtail the promotional rights of some incumbent officers, because it would effectively grant the new hires additional points on the promotional exam that they would not otherwise receive.

In addition, the settlement agreement impinges on other benefits which, although not determined purely according to seniority, are worded in such a way that seniority will have a substantial and often decisive impact. For example, Article 28 of the PBA agreement, entitled "Seniority Privileges," states that once operational needs have been met, "seniority in rank will be given preference with respect to days off and vacation time." [R1-9-At. 3 at 41] The firefighters'

24

agreement contains a similar provision. Both collective bargaining agreements contain provisions that allocate other benefits such as shift preference and transfer requests according to seniority once operational needs have been met. Those provisions confer rights and benefits upon union members that the proposed consent decree would undermine or diminish.

The United States does not dispute that the proposed agreement would harm the interests of current police and firefighters to some extent. Counsel for the United States conceded at the fairness hearings that incumbent employees "may even be slightly diminished in their rights" by the proposed consent decree, which is akin to saying that the rights of a pedestrian in a crosswalk may be slightly diminished by a runaway truck. Notwithstanding its concession, the United States contends that infringement of incumbent employee rights does not allow those employees to block approval of the settlement, because it is "speculative" whether the proposed agreement's grant of retroactive seniority will cause any incumbent employees to lose a shift or vacation preference or be called back for mandatory overtime.

That contention cannot survive examination against existing decisional law. In *City of Miami,* the Court invalidated parts of a consent decree altering the City's procedure for promoting police officers even though it was impossible to determine in advance which—or even that—officers would be affected by the change; the mere threat of injury to contractual rights was held to be sufficient. *See City of Miami,* 664 F.2d at 446 (Rubin, J., concurring).[4] As a result, under the law of this Circuit, the retroactive seniority provision's threat to the objectors' competitive seniority benefits prevented entry of the consent decree. The objectors were not required to prove with

---

[4]*See supra* note 2.

certainty that particular employees would lose contractual benefits. In any event, it is obvious that the decree in this case would have adversely affected at least some of the incumbent employees.

The United States also argues that the proposed grant of retroactive seniority cannot be said to impinge upon the rights of incumbent employees, because the City retains some discretion in allocating many of the benefits in the collective bargaining agreements. There are two major problems with that argument. First, as discussed above, some of the competitive seniority rights are not subject to the City's discretion at all. The opportunity for firefighters to receive hazardous materials training, and the right of police officers to receive the benefit of extra points on their competitive sergeant's exam for years of service are contractual rights that accrue with seniority, and the City has reserved no authority under the collective bargaining agreements to infringe those rights. That alone is enough to defeat the United States' discretion argument.

Second, the discretion argument misses the point anyway. Seniority rights subject to the City's exercise of some discretion in certain circumstances are neither the same as no seniority rights at all, nor are they the same as seniority rights subject to additional exceptions. Nothing in either collective bargaining agreement authorized the City to modify seniority rights across the board. *Cf. People Who Care v. Rockford Bd. of Educ.,* 961 F.2d 1335, 1337 (7th Cir.1992) ("When the parties to a decree seek to enlarge their legal entitlements—to grant themselves rights and powers that they could not achieve outside of court—their agreement is not enough.").

Florida law supports the conclusion that the proposed consent decree would contravene the contractual rights of Hialeah police and firefighters, because Florida statutory and constitutional law give public employees a right to bargain collectively. *See, e.g., Hillsborough County Governmental Employees Ass'n, Inc. v. Hillsborough County Aviation Auth.,* 522 So.2d 358, 363 (Fla.1988).

Collective bargaining is required by Florida law for important terms of employment such as shift assignments, promotions, vacation time, and mandatory overtime. *See, e.g., City of Miami,* 664 F.2d at 446 ("Under Florida law promotion is a subject for collective bargaining for public employees."); *City of Miami v. F.O.P. Miami Lodge 20,* 571 So.2d 1309, 1312-13 (Fla.Dist.Ct.App.1989) (holding that public sector employers are obligated to engage in collective bargaining process over broad range of issues, including "wages, hours, and terms and conditions of employment" as well as any changes in those terms or conditions), *approved,* 609 So.2d 31 (Fla.1992). Altering collectively bargained benefits through non-collective bargaining mechanisms is contrary to Florida law.

Furthermore, public policy dictates that parties to a labor agreement either live up to the terms of that agreement or pay for the opportunity to alter those terms. "[P]arties to a collective-bargaining agreement must have reasonable assurance that their contract will be honored." *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 771, 103 S.Ct. 2177, 2186, 76 L.Ed.2d 298 (1983). One party to a collective bargaining agreement cannot use the device of a nonconsensual consent decree to avoid its obligations, which the other party negotiated and bargained to obtain. As we have previously observed in these circumstances: "The Florida cases hold that, when a subject is encompassed within the terms of an existing contract, a public employer may not foreclose bargaining on the subject or unilaterally alter the terms and conditions of employment." *City of Miami,* 664 F.2d at 447.

Because a grant of retroactive seniority would alter the rights and benefits of incumbent employees under the collective bargaining agreements, approval of that part of the proposed decree over the unions' objections would violate the police and firefighters' collective bargaining rights under Florida law. If the City wants to alter the manner in which competitive benefits are allocated,

27

it must do so at a bargaining table at which the unions are present. Or, that must be done pursuant

to a decree entered after a trial at which all affected parties have had the opportunity to participate.

3. *If a Title VII Violation is Established at Trial, the District Court Can Consider the Remedy Set Out in the Proposed Decree*

If a Title VII violation is found after a trial at which the affected parties are represented,

modification of otherwise legally enforceable seniority rights may be part of a necessary and

appropriate remedy. *See United States v. City of Chicago,* 978 F.2d 325, 332 (7th Cir.1992)

("[U]nder some circumstances, federal courts may require an innocent third party to participate in

remedies for illegal discrimination."). To the extent necessary and proper, Florida law will have to

yield in that situation. But modifying seniority rights to remedy a Title VII violation found after a

trial is entirely different from modifying them without a trial based upon a "consent decree" to which

adversely affected parties have objected. The important point is that an objecting party is entitled

to an adjudication of its rights on the merits before those rights are infringed or modified by court

decree. The district court was correct in concluding that it lacked the authority to deprive the

objecting parties of that entitlement in this case.[5]

4. *Summary*

What happened in this case is that the Department of Justice and the City of Hialeah crafted

a settlement agreement without the consent or input of the unions or individual police and

firefighters whose contractual rights, recognized and protected under Florida law, would be affected

---

[5]Because we conclude that the district court lacked the authority to approve the settlement agreement, we need not consider the government's contention that the district court erred in finding that the retroactive seniority provision should not be approved because it would have an unusual, unfair adverse impact on current employees. *See Franks v. Bowman Transp. Co., Inc.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

by the agreement. The Department refused to permit the police and firefighters to participate in the negotiations. The resulting settlement agreement and proposed consent decree would impair important rights guaranteed to the police officers and firefighters in their collective bargaining agreements.

At several points in its briefs, the United States cites the policy favoring negotiation and settlement of Title VII claims in support of its argument that the district court should have approved the agreement and decree. The United States also argues that a consent decree that it negotiates carries a considerable presumption of validity because the Department of Justice represents the interests of all citizens. *See Williams v. City of New Orleans,* 729 F.2d 1554, 1560 (5th Cir.1984). These arguments are heavy with irony, given that the Department of Justice restricted its "negotiations" to the City, a party with no interest adverse to the Department's competitive seniority proposals. If the Department had been concerned about the interests of all citizens and had been interested in "negotiation" and "settlement" in the non-Orwellian sense, it would have attempted to reach an agreement with all of those whose rights were at stake. Instead, the Department disregarded the interests and rights of some parties based upon their race, and it asked a United States district court to do the same. The district court correctly rejected the Department of Justice's request to ram the proposed settlement agreement down the throats of the unions and individual objectors without affording them a fair adjudication of their rights.

As Judge Gee recognized in *City of Miami,* for the district court to enter a proposed decree in such a situation would contravene basic principles of fairness:

> An appellant is before us complaining that it has had no day in court—has never been set for trial or had notice of a setting—but has been judged away. This error is so large and palpable that, like an elephant standing three inches from the viewer's eye, it is at first hard to recognize. The major dissent is reduced to arguing that it is all right to enter a permanent

29

injunction without a trial against one who is unable, in advance of such a trial, to show the court how his rights will be infringed by the order. Here is new law indeed, law that we cannot accept.

*City of Miami,* 664 F.2d at 451 (Gee, J., concurring in part and dissenting in part). Just as the en banc court did in *City of Miami,* we see the elephant. We will not close our eyes to its existence. We will not hold that a party's legally enforceable contractual rights can be discarded without affording that party the right to litigate the case on the merits.

## C. JURISDICTION OVER THE SUAU OBJECTORS' CROSS-APPEAL

In their cross-appeal, the Suau objectors contend that the district court erred in concluding that the United States had demonstrated a prima facie case of discrimination. Because we affirm the district court's refusal to enter the consent decree, the Suau cross-appeal is moot. *See, e.g., Pacific Ins. Co. v. General Development Corp.,* 28 F.3d 1093, 1096 (11th Cir.1994) (per curiam) (appeal is moot when it fails to present a controversy with respect to which the court can provide meaningful relief). Accordingly, their cross-appeal is due to be dismissed. However, as we have pointed out, the Suau objectors, at least, were refused a full and fair opportunity to present their own evidence and to meaningfully test the statistics upon which the effort to establish a prima facie case was based. Our dismissal of the cross-appeal on jurisdictional grounds should not be read to imply that the question of whether a prima facie case exists has been settled.

## IV. CONCLUSION

A district court may not enter parts of a proposed consent decree that operate to diminish the legal rights of a party who objects to the decree on that basis. The part of the decree at issue in this case would diminish the contractual seniority rights of incumbent Hialeah police officers and

30

firefighters, who objected to it for that reason. Therefore, the district court's refusal to enter that part of the decree was proper.

We AFFIRM the district court's judgment. The Suau objectors' cross-appeal is DISMISSED AS MOOT.

KRAVITCH, Senior Circuit Judge, dissenting:

I agree that this court may review the decision of the district court refusing to approve the proposed consent decree, and accordingly I join Section III.A of the majority opinion.[1] Because I disagree with the majority's interpretation of the law and its resolution of the merits of the United States' appeal, I respectfully dissent from Section III.B of the majority opinion. My resolution of the merits necessitates review of the cross-appeal; I therefore do not join Section III.C of the majority opinion.

## I.

## A.

In its Order Denying Approval of the Settlement, the district court found that the United States had demonstrated a "valid basis for the race-conscious relief sought in the Agreement"[2] by

---

[1]To supplement the majority's discussion of *Carson's* irreparable injury requirement, I add that to require the United States to litigate on the merits to resolve whether the seniority proposal is permissible would burden the class of *discriminatees, see Carson v. Am. Brands,* 450 U.S. 79, 89, 101 S.Ct. 993, 999, 67 L.Ed.2d 59 (1981) (stating that petitioners were harmed by inability to achieve "immediate restructuring of respondents' transfer and promotional policies"), undermine the policy of "make-whole" relief in Title VII cases, *see Franks v. Bowman Transp. Co.,* 424 U.S. 747, 765-66, 96 S.Ct. 1251, 1265, 47 L.Ed.2d 444 (1976), and contradict the "strong preference for encouraging voluntary settlement of employment discrimination claims," *Carson,* 450 U.S. at 88 n. 14, 101 S.Ct. at 998 n. 14.

[2]Order at 7.

demonstrating a "gross statistical disparity"[3] and thus establishing a *prima facie* case of discrimination.[4] The district court concluded, however, that it could not "bind non-consenting parties to a consent decree"[5] and, alternatively, that the proposed settlement agreement was not fair to incumbent employees.[6] The majority concludes that the district court was correct because a district court may not approve "a proposed consent decree ... if it would affect the legal rights of the objecting parties." Because I believe that both rationales advanced by the district court were based upon incorrect interpretations of the law and that the majority rests its affirmance upon a similarly flawed basis, I would reverse the order refusing to approve the consent decree.

The majority relies upon *White v. Alabama,* 74 F.3d 1058 (11th Cir.1996), and *United States v. City of Miami,* 664 F.2d 435 (Former 5th Cir.1981) (en banc), for the proposition that "parts of [a] decree [that] affect [a] third party who did not consent to it ... cannot properly be included in a valid consent decree." *City of Miami,* 664 F.2d at 442.

*City of Miami,* however, recognized that a consent decree *can* abridge the contractual rights of a nonconsenting party, as long as there has been a "trial or examination" before the district court to determine whether the remedy sought is justified by past discrimination. 664 F.2d at 447. In *City*

---

[3]*Id.* at 9. The United States proffered statistical evidence in the affidavit of Marian Thompson, Ph.D., which showed, *inter alia,* that at the time of the fairness hearing in 1994 only one of the 235 members of the fire department was black; that none of the 124 entry-level firefighters was black; that only five of the 313 sworn police department employees were black; and that only four of the 240 entry-level police officers were black. *See* U.S. Reply Br. at 8; R. 2-18, attachment A at 2 n.1 and 8-9 n.4. The affidavit averred that the relevant labor market was either 17.2% black or 16.1% black, depending upon which definition of the labor market was used.

[4]Order at 8.

[5]*Id.* at 12-13.

[6]*Id.* at 15.

32

*of Miami,* the challenged consent decree would have entitled members of the class of discriminatees who had not taken the civil service test to receive promotions ahead of employees who had taken and passed the test. The decree was challenged by employees who claimed that their collective bargaining rights would be impaired by the decree. The mandate of the court of appeals required modification of the decree to provide that it would not affect promotion rights of the objecting employees. The appellate court reasoned that the district court failed to find past discrimination by the City that would justify the remedies in the consent decree and, *a fortiori,* would justify an abridgment of the interests of non-consenting third parties. *Id.* at 447. The court stated:

> The right to promotion on the basis of test accomplishment may not be obliterated without a demonstration that the City has, in making promotions, discriminated against members of the affected classes in the past and that affirmative action is a necessary or appropriate remedy or that it has so discriminated in employment policy as to unfairly prejudice the opportunity of the affected class to achieve promotions.

*Id.* at 446-47 (Rubin, J., concurring). The court concluded that "[t]hose who seek affirmative remedial goals that would adversely affect other parties must demonstrate the propriety of such relief." *Id.* at 447. The court did not hold, however, that a consent decree that affects the contractual rights of nonconsenting parties categorically is unlawful. Rather, the court expressly held that a sufficient showing of past discrimination by the United States would justify relief sought on behalf of the discriminatees. *See id.* ("If, on remand, the United States shows that the City's practices have discriminated against individuals in or members of the affected class in such a way as adversely to affect their promotions, the district court shall fashion an appropriate remedy invoking its "sound equitable discretion.' ") (quoting *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 770, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976)).

33

Five years after the court decided *City of Miami,* the Supreme Court confirmed that a court may enter a consent decree despite the objections of a party to the action. In *Local No. 93 v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), the Court held that an intervening union's consent was not required to obtain court approval of a consent decree that arguably affected the contractual rights of the union's members. As in the case before us, the class of plaintiff-discriminatees and the city in *Local No. 93* agreed to enter a consent decree providing remedial relief—including reserved planned promotions for minority employees and modification of the application of the seniority system to benefit discriminatees[7]—to which the union objected. The Court stated:

> It has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent.

*Id.* at 528-29, 106 S.Ct. at 3079.[8] The Court was careful to distinguish between consent decrees that "impose[ ] *obligations* on a party that did not consent to the decree" or that dispose of a

---

[7]The United States notes that the contested remedy in the case *sub judice*—retroactive remedial seniority—is less far-reaching than the remedy in *Local No. 93,* which was extended to individuals who were not actual victims of the City's discriminatory practices.

[8]The majority recites this language, yet renders it fully without content by reading this circuit's precedent to mean that "the objection of a party whose rights or claims would be adversely affected does bar a proposed consent decree." The majority relies upon *City of Miami,* decided five years before the Supreme Court's decision in *Local No. 93.* Even if *City of Miami* had held that a mere adverse effect upon contractual expectations of an objecting party were sufficient to preclude entry of an otherwise valid consent decree—a reading of *City of Miami* that I believe is incorrect, *see supra,* Section I.A.—that holding was overruled in *Local No. 93.* Although *White,* the only other Eleventh Circuit case relied upon by the majority, was decided after *Local No. 93,* a close reading of that case makes clear that it, too, is not inconsistent with *Local No. 93* and does not support the majority's position. *See infra.*

nonconsenting party's *legal claims for relief, id.* at 529, 106 S.Ct. at 3079 (emphasis added), and

those that merely *affect* a nonconsenting party.  The Court explained:

> Of course, parties who choose to resolve litigation through settlement may not dispose of the
> claims of a third party, and *a fortiori* may not impose duties or obligations on a third party,
> without that party's agreement.  A court's approval of a consent decree between some of the
> parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly
> raised, these claims remain and may be litigated by the intervenor.  And, of course, a court
> may not enter a consent decree that imposes obligations on a party that did not consent to
> the decree.  However, the consent decree entered here does not bind Local No. 93 to do or
> not to do anything.  It imposes no legal duties or obligations on the Union at all....

*Id.* at 529-30, 106 S.Ct. at 3079 (citations omitted).  Therefore, a consent decree that "does not bind

[the non-consenting party] to do or not to do anything," *id.* at 529-30, 106 S.Ct. at 3079, and that

does not impose any "legal duties or obligations" upon that party—duties the breach of which could

lead to "contempt of court for failure to comply with its terms," *id.* at 530, 106 S.Ct. at 3079—is not

invalid.  Likewise, a decree that does not impermissibly dispose of the valid claims for relief of a

nonconsenting party is lawful.

The consent decree at issue here, like the decree at issue in *Local No. 93,*[9] does not impose

any legal obligations upon the nonconsenting parties.  The appellees would not be required by the

decree "to do or not to do anything."  *Local No. 93,* 478 U.S. at 530, 106 S.Ct. at 3079.  Nor do the

objectors have any legal claims for relief that could be disposed of by the proposed consent decree.

---

[9]Contrary to the majority's contention, it appears that the intervening union in *Local No. 93*
asserted interests similar to those asserted by the intervenors here.  *See Local No. 93,* 478 U.S. at
507, 106 S.Ct. at 3067 (noting that union contended that consent decree would "deny those most
capable from [sic] *their* promotions") (emphasis added); *Vanguards of Cleveland v. City of
Cleveland,* 753 F.2d 479, 484-85 (6th Cir.1985) (noting that union claimed that consent decree's
affirmative action plan "penalizes innocent non-minority firefighters" and stating that "[s]ince
non-minorities do not have a legally protected interest in promotions which could only be made
pursuant to discriminatory employment practices, it follows that the legal rights of
non-minorities will not be adversely affected by *reasonable* and *lawful* race-conscious hiring or
promotional remedies") (emphasis in original), *aff'd, Local No. 93, supra.*

35

Appellees became parties to this action solely to voice their views on the fairness of the settlement; they have at no time during this litigation asserted "a cause of action in [their] own right[,] and [they] could not prosecute reverse discrimination claims (of [their] members) that [have] not yet arisen." *White v. Alabama,* 74 F.3d 1058, 1075 n. 53 (11th Cir.1996); *cf. Kirkland v. N.Y. State Dept. of Correctional Serv.,* 711 F.2d 1117, 1126 (2d Cir.1983) (approving of district court's decision to let non-minorities intervene "for the sole purpose of objecting to the settlement"; stating that "although non-minority third parties allowed to intervene in cases which involve consent decrees or settlement agreements implementing race-conscious hiring or promotional remedies do have a sufficient interest to argue that the decree or agreement is unreasonable or unlawful, their interest in the expectation of appointment does not require their consent as a condition to any voluntary compromise of the litigation"). Instead, their argument is that their contractual rights will be adversely affected by the decree.

That argument, however, is foreclosed not only by *Local No. 93, see* 478 U.S. at 528, 106 S.Ct. at 3078-79 (holding that argument that "because the Union was permitted to intervene as of right, its consent was required before the court could approve the consent decree ... misconceives the Union's rights in the litigation"), but also by the Supreme Court's opinion in *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), which stands for the proposition that a third party cannot block approval of a consent decree merely because the party will be "affected" by the decree. In *Franks,* the Court held that retroactive competitive seniority relief—the relief challenged in the case *sub judice*—was necessary to ensure full relief for the victims of discrimination. *Id.* at 771, 96 S.Ct. at 1267. The union in that case, like the appellees in the case before us, objected to retroactive competitive seniority benefits for the discriminatees, claiming that

such relief would affect the rights of employees who had not been victims of discrimination. *Id.* at

773, 96 S.Ct. at 1268. The Court stated:

> Certainly, there is no argument that the award of retroactive seniority to victims of hiring
> discrimination in any way deprives other employees of indefeasibly vested rights conferred
> by the employment contract. This Court has long held that employee expectations arising
> from a seniority system agreement may be modified by statutes furthering a strong public
> policy interest.

*Id.* at 778, 96 S.Ct. at 1271.[10] Because claims under Title VII "involve the vindication of a major

public interest," *id.* at 778 n. 40, 96 S.Ct. at 1271 n. 40 (quoting Section-By-Section Analysis of

H.R. 1746, accompanying the Equal Employment Opportunity Act of 1972 Conference Report, 118

Cong.Rec. 7166, 7168 (1972)), appellees' assertion that an award of retroactive seniority benefits

impairs their contractual rights cannot defeat an otherwise valid consent decree.[11] Rather, to object

---

[10]The Court explained:

> [I]t is apparent that denial of seniority relief to identifiable victims of racial
> discrimination on the sole ground that such relief diminishes the expectations of
> other, arguably innocent, employees would if applied generally frustrate the
> central "make-whole" objective of Title VII. These conflicting interests of other
> employees will, of course, always be present in instances where some scarce
> employment benefit is distributed among employees on the basis of their status in
> the seniority hierarchy.... Accordingly, we find untenable the conclusion that this
> form of relief may be denied merely because the interests of other employees may
> thereby be affected.

> *Franks,* 424 U.S. at 774-75, 96 S.Ct. at 1269.

[11]The appellees'—and the majority's—reliance upon contract expectations protected by
Florida law thus is unavailing. The economic expectations of the current employees and
provisions of Florida law protective of employment benefits cannot trump the rights granted to
all workers by Congress in Title VII. *See* U.S. Const. art. VI. Moreover, the majority's insistence
that appellees would be unfairly burdened by the proposed consent decree ignores the impact of
the City's past discrimination upon the seniority ladder appellees seek to protect. The
controversial provision in the consent decree awarding retroactive seniority would merely restore
incumbent employees to the place in the hierarchy that they would have occupied absent
discrimination. *See Franks,* 424 U.S. at 767, 96 S.Ct. at 1265 ("A concomitant award of the

successfully to a decree between consenting parties, the objecting party must show that the challenged consent decree has disposed of a legal claim or imposed legal obligations or duties upon that party. This appellees have not done.

The majority's reliance upon *White v. Alabama,* 74 F.3d 1058 (11th Cir.1996), is misplaced, as well. In *White,* a class of African-American voters sued alleging that the at-large scheme for electing state appellate judges diluted the voting strength of African-American voters, and the class requested relief in the form of a proportional representation scheme. Another plaintiff intervened, purporting to represent a class of African-American voters and seeking single-member districts. The court of appeals invalidated a final order of the district court that the parties to the case categorized as a consent decree; the order would have provided in large part the relief sought by the initial class of plaintiffs and thus would have denied the relief sought by the intervenors despite their objections to the decree. The court of appeals invalidated the decree approved by the district court because it would have "provide[d] relief beyond that authorized by Congress" in the Voting Rights Act. *White,* 74 F.3d at 1074. In addition, and of relevance to the appeal before us, the court in *White* distinguished *Local No. 93* because the objecting party in *White* was a plaintiff prosecuting a cause of action. Whereas in *Local No. 93* the "union's sole reason for intervening in the case ... was to

---

seniority credit [that a discriminatee] presumptively would have earned but for the wrongful treatment would also seem necessary in the absence of justification for denying that relief."). The majority's suggestion that the rights of incumbent employees would be diminished by the decree much as would be "the rights of a pedestrian in a crosswalk ... by a runaway truck" ignores the actual victims of discrimination in this case, who merely hope to obtain the relief that Congress has provided and that the Supreme Court unequivocally has stated is available to victims of illegal discrimination. *See id.* at 774, 96 S.Ct. at 1269. Indeed, "the State has the power to eradicate racial discrimination and its effects in both the public and private sectors, and the absolute duty to do so where those wrongs were caused intentionally by the State itself." *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 518, 109 S.Ct. 706, 735, 102 L.Ed.2d 854 (1989) (Kennedy, J., concurring in part).

protest the settlement," *White,* 74 F.3d at 1075 n. 53, in *White* the settlement would have disposed of a cause of action properly raised in the objector's pleadings, *see id.* at 1073 n. 49 (noting that the nonconsenting party intervened as a plaintiff and filed a complaint alleging that "he represented a class consisting of all of Alabama's black voters" and seeking relief in the form of an order mandating single-member districts for the election of Alabama appellate judges, relief that was "totally inconsistent" with that sought by the other plaintiff class).

*White* thus recognized the uncontroversial proposition that a court may not resolve by a settlement order the pleaded claims for relief of a party before the court without that party's consent. *See Local No. 93,* 478 U.S. at 529, 106 S.Ct. at 3079 ("A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor."). In the case before us, however, the objecting parties did not present any claim for relief to the district court, but rather joined the action solely to protest the proposed settlement. *Local No. 93* expressly held that the refusal of such a party to consent to a proposed settlement does not invalidate the agreement, as long as the party had a chance to "present evidence and have its objections heard at the hearings on whether to approve the consent decree." *Local No. 93,* 478 U.S. at 529, 106 S.Ct. at 3079. The district court thus erred in concluding that it could not approve the consent decree over appellees' objections.

B.

The majority holds that the contractual rights of the objecting parties—parties who are not prosecuting a legal claim for relief in this action, *see White,* 74 F.3d at 1075 n. 53, and who thus cannot preclude entry of the consent decree, *see Local No. 93,* 478 U.S. at 528-29, 106 S.Ct. at

39

3079—may be affected only after a "trial on the merits." In *Local No. 93,* however, the Supreme Court squarely held that the union that objected to the consent decree could not preclude its entry simply because there had been no trial on the merits. The district court's fairness hearing in that case sufficed to justify entry of the decree, notwithstanding the union's argument that it would affect the contractual expectations of its members. The Court stated:

> Here, Local No. 93 took full advantage of its opportunity to participate in the District Court's hearings on the consent decree. It was permitted to air its objections to the reasonableness of the decree and to introduce relevant evidence; the District Court carefully considered these objections and explained why it was rejecting them. Accordingly, "the District Court gave the union all the process that it was due...."

478 U.S. at 529, 106 S.Ct. at 3079 (quoting *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 400, 102 S.Ct. 1127, 1136, 71 L.Ed.2d 234 (1982)). As in the case *sub judice,* the district court in *Local No. 93* had conducted a fairness hearing to consider the propriety of the proposed consent decree. *See Local No. 93,* 478 U.S. at 508, 106 S.Ct. at 3068. It is clear, then, that a district court may enter a consent decree despite the objections of a party after conducting a fairness hearing at which the objector "is entitled to present evidence and have its objections heard,"[12] *Local No. 93,* 478 U.S. at 529, 106 S.Ct. at 3079, even if the decree modifies "employee expectations arising from a seniority

---

[12]*Local No. 93* did not create a broad right of intervenors to a quasi-trial, but rather simply required a district court conducting a fairness hearing to allow a party objecting to a proposed settlement agreement to "present evidence and have its objections heard." 478 U.S. at 529, 106 S.Ct. at 3079. Contrary to the assertion of the majority, the district court thus was under no obligation to permit the Suau objectors to cross-examine the United States' expert witness or to conduct discovery. The majority also suggests that the Suau objectors were not permitted to offer statistical evidence of their own. This assertion finds no support in the record; indeed, the Suau objectors do not contend on appeal that they were denied the opportunity to "present evidence and have [their] objections heard" because they were given an opportunity to do so at the fairness hearing. *See* R3 at 22-29 (transcript of 8/11/94 fairness hearing). Moreover, the Suau objectors in fact presented their objections to the proposed consent decree and filed a notice of their objections with the district court. *See* Order at 5.

system agreement," *Franks,* 424 U.S. at 778, 96 S.Ct. at 1271.[13] *City of Miami* is not to the contrary, *see* 664 F.2d at 447 ("[I]n the absence of either a trial *or an examination ...* by the district court, we are not prepared to hold that the consent decree is valid insofar as it deprives the [union] and its members of the benefit of the promotion procedure ....") (emphasis added), and, to the extent that the majority reads it to be so, it cannot bind this court, *see Local No. 93,* 478 U.S. at 529, 106 S.Ct.

---

[13]In addition, a finding by the district court of a *prima facie* case of discrimination that is supported by the record is sufficient to justify race-conscious relief. *See Howard v. McLucas,* 871 F.2d 1000, 1006 (11th Cir.), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989); *Kirkland,* 711 F.2d at 1130 ("[A] showing of a prima facie case of employment discrimination through a statistical demonstration of disproportionate racial impact constitutes a sufficiently serious claim of discrimination to serve as a predicate for a voluntary compromise containing race-conscious remedies."); *see also Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (holding that city set-aside plan lacked strong basis in evidence because "there [was] nothing approaching a *prima facie* case of constitutional or statutory violation by anyone in the Richmond construction industry"); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 277, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986) (holding that district court should respond to challenge to race-conscious relief by making "a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary"). The district court's finding of a *prima facie* case in the case before us was made in the course of consideration of the proposed settlement agreement. A district court's task in reviewing such an agreement is to ascertain that "the proposal represents a reasonable factual and legal determination based on the facts of the record, whether established by evidence, affidavit, or stipulation" and that any effect on third parties is "neither unreasonable nor proscribed." *City of Miami,* 664 F.2d at 441; *accord City of Alexandria,* 614 F.2d at 1362. In this case, the district court's reliance upon the statistical evidence presented in an affidavit by an expert represented "a reasonable factual and legal determination" as a predicate for a decision whether to approve a settlement agreement. *City of Miami,* 664 F.2d at 441. Moreover, the district court's finding is supported by the record. The statistical evidence showed a stark disparity between the percentage of blacks available in the relevant labor markets and the number of blacks employed. *See supra,* Section I.A n.3; *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 307-308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 339-340 n. 20, 97 S.Ct. 1843, 1856 n. 20, 52 L.Ed.2d 396 (1977). Appellees' argument that the United States did not establish an evidentiary basis sufficient to justify race-conscious relief thus is without merit.

at 3079. The district court's conclusion that it lacked the authority to approve the proposed consent decree under these circumstances[14] thus was erroneous.

C.

The district court also based its decision refusing to approve the proposed consent decree upon a finding that the decree was unfair to incumbent employees. Because the majority concludes that the consent decree impermissibly would have compromised the rights of the objectors, the majority does not decide whether the district court's conclusion that the decree was unfair is supportable under applicable law. Because I believe that the majority's conclusion is incorrect, I address the district court's alternative basis for refusing to approve the decree.

The Supreme Court stated in *Franks* that

> the denial of seniority relief to victims of illegal racial discrimination in hiring is permissible "only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."

424 U.S. at 771, 96 S.Ct. at 1267 (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975)). Indeed, the Court stated that "the issue of seniority relief cuts to the very heart of Title VII's primary objective of eradicating present and future discrimination in a way that backpay, for example, can never do." *Id.* at 768 n. 28, 96 S.Ct. at 1266 n. 28. "[O]rdinarily such relief will be necessary to achieve the "make-whole' purposes of [Title VII]." *Id.* at 766, 96 S.Ct. at 1265.

---

[14]*See* Order at 12-13 ("The Court finds that approval in the face of these objections would not be appropriate because the Court cannot bind non-consenting parties to a consent decree.").

42

The district court here held that the proposed agreement was unfair to incumbent employees because it would have an "unusual, adverse impact."[15] Specifically, the district court relied in large part upon its conclusion that incumbent employees' "vested, contractual rights will be diminished."[16] As the United States argues, however, contractual rights of the incumbent employees would not be altered under the proposed agreement; rather only the relative position of those employees in the hierarchy would be affected—and no more so than would have occurred absent discrimination. *Cf. Franks,* 424 U.S. at 767, 96 S.Ct. at 1265 ("A concomitant award of the seniority credit he presumptively would have earned but for the wrongful treatment would also seem necessary in the absence of justification for denying that relief."). The Court explained,

> [I]t is apparent that denial of seniority relief to identifiable victims of racial discrimination on the sole ground that such relief diminishes the expectations of other, arguably innocent, employees would if applied generally frustrate the central "make-whole" objective of Title VII. These conflicting interests of other employees will, of course, always be present in instances where some scarce employment benefit is distributed among employees on the basis of their status in the seniority hierarchy.... Accordingly, we find untenable the conclusion that this form of relief may be denied merely because the interests of other employees may thereby be affected.

*Franks,* 424 U.S. at 774-75, 96 S.Ct. at 1269.

The district court also based its conclusion upon the "strong likelihood ... that an atmosphere of hostility and animosity would arise between the incumbent employees and the incoming victim class."[17] The opposition or hostility of incumbent employees to remedial measures for victims of discrimination, however, is not a valid basis upon which to deny relief. *See, e.g., Local No. 93,* 478 U.S. at 511, 106 S.Ct. at 3069 (affirming district court's approval of consent decree despite union's

---

[15]Order at 17.

[16]Order at 16.

[17]Order at 18.

objection that relief would cause "serious racial polarization"); *Equal Employment Opportunity Comm'n v. Rath Packing Co.,* 787 F.2d 318, 335 (8th Cir.) (holding that district court abused its discretion in denying retroactive seniority and rejecting employer's claim that relief would "lower employee morale" because "[t]hese consequences can be expected in almost all Title VII cases"), *cert. denied,* 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986).

The district court's reasons for finding that the proposed settlement agreement was unfair thus lack a basis in law. Although the standard of appellate review of a district court's refusal to approve a consent decree is "not crystal clear," *see Stovall,* 117 F.3d at 1240, a district court's order premised solely upon an erroneous interpretation of the law merits reversal whether the court of appeals reviews the decision *de novo* or for abuse of discretion.[18] This is particularly so in light of Congress's "strong preference for encouraging voluntary settlement of employment discrimination claims," *see Carson,* 450 U.S. at 88 n. 14, 101 S.Ct. at 998 n. 14, a preference that could be defeated if district courts were given unbridled discretion "to impose their views of reasonableness ... on settlements reached by the government agencies responsible for the enforcement of Title VII rights," *City of Alexandria,* 614 F.2d at 1362. Because the district court erroneously believed that the consent decree impermissibly would burden the appellees' rights, misapprehended the law with respect to non-consenting parties and consent decrees, yet made findings adequate to support

---

[18]In *Stovall v. City of Cocoa,* 117 F.3d 1238, 1240 (11th Cir. 1997), the court concluded that a court of appeals should "tailor the standard of review to the district court's rationale for rejecting the proposed consent decree." The court distinguished a legal determination by the district court "that a proposed decree would be unlawful," which should be subject to *de novo* review, from "a conclusion that a proposed decree would be unreasonable or unfair," which should be reviewed for abuse of discretion. *Id.*

44

remedial retroactive seniority for the victims of discrimination, I would hold that the district court's decision refusing to approve the consent decree should be reversed.

II.

Because the majority affirms the district court's judgment refusing to approve the consent decree, the majority does not address the cross-appeal of the Suau objectors, who contend that the district court erred in concluding that the United States demonstrated a *prima facie* case of discrimination. I disagree with the majority's resolution of the merits of the United States' appeal, however, and accordingly conclude that the cross-appeal is not moot and should be addressed.

The United States contends that this court lacks jurisdiction over the Suau objectors' cross-appeal challenging the district court's finding of a *prima facie* case of discrimination because the objectors do not appeal from a final order, *see* 28 U.S.C. § 1291, or from an order denying them injunctive relief, *see* 28 U.S.C. § 1292(a)(1); *Carson, supra.* Because the Suau objectors do not—and could not—claim that the district court's finding that the United States established a *prima facie* case was a final order under section 1291, they can seek appellate review of that finding only if the finding independently satisfies section 1292(a)(1), discussed *supra,* or if the finding is so related to the ruling appealed by the United States as to be "inextricably intertwined" with that ruling. *See Swint v. Chambers County Commission,* 514 U.S. 35, 50-51, 115 S.Ct. 1203, 1212, 131 L.Ed.2d 60 (1995).

This court lacks jurisdiction over the cross-appeal independent of its jurisdiction over the United States' appeal because a finding that the United States established a *prima facie* case of discrimination is not a denial of *injunctive* relief appealable under section 1292(a)(1). *See Equal Employment Opportunity Comm'n v. Pan Am. World Airways, Inc.,* 796 F.2d 314, 316-17 (9th

45

Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 829 (1987); *accord Shee Atika v. Sealaska Corp.,* 39 F.3d 247, 249 (9th Cir.1994). This court thus can entertain the cross-appeal only if it is essential to the resolution of, or inextricably intertwined with, the United States' appeal.

In *Swint,* the Supreme Court reversed a decision of a panel of the Eleventh Circuit that impermissibly had exercised appellate jurisdiction over a claim merely pendent to a reviewable collateral order. Although recognizing that the Court had not "universally required courts of appeals to confine review to the precise decision independently subject to appeal," at 50, 115 S.Ct. at 1211, the Court made clear that "there is no "pendent party' appellate jurisdiction," *id.* at 51, 115 S.Ct. at 1212. The Court did not settle "whether or when it may be proper for a court of appeals with jurisdiction over one ruling to review, conjunctively, related rulings that are not themselves independently appealable," *id.,* because the parties in *Swint* did not—and could not—contend that the district court decision in question was "inextricably intertwined" with the decision over which the court of appeals properly had jurisdiction or that "the former decision was necessary to ensure meaningful review of the latter," *id.* Although the Court in *Swint* specifically addressed the scope of appellate jurisdiction over collateral orders, *see Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), the language of the opinion is broad enough to encompass appeals brought pursuant to section 1292(a)(1) as well.

It is a close question whether this court enjoys appellate jurisdiction over the cross-appeal. In determining whether resolution of the correctness of the district court's finding that the United States established a *prima facie* case of discrimination is "necessary to ensure meaningful review" of the United States' appeal, *Swint,* at 51, 115 S.Ct. at 1212, over which we have jurisdiction, this court should consider whether the district court's conclusion effectively is a predicate to our

conclusion on the merits of the United States' appeal. Because an evaluation of the merits of the United States' appeal necessarily involves reference to, and reliance upon, the district court's finding that the United States established a *prima facie* case justifying race-conscious relief, *see supra,* Section I.C n.13, this court arguably can exercise appellate jurisdiction over the cross-appeal.

Of course, as the United States argues, the Suau objectors' cross-appeal may be characterized more properly as an alternative argument for affirmance in the main appeal, in which case this court may review the claim. Because the Supreme Court in *Swint* made clear that a court of appeals should not readily exercise jurisdiction over "related rulings that are not themselves appealable," at 50, 115 S.Ct. at 1212, and because I address the substance of the cross-appeal in my discussion of the merits of the United States' appeal, *see supra,* Section I.C n.13, I would hold that this court lacks the authority to review independently the district court's conclusion that the United States established a *prima facie* case of discrimination.

### III.

In my view, the majority has misapplied the law in affirming the district court's refusal to approve the proposed consent decree. Because I believe that the proposed decree permissibly would provide relief for the victims of discrimination and that the district court lacked a basis in controlling law to refuse to approve the decree, I would reverse the decision of the district court and remand with instructions for the court to approve the proposed decree.

Accordingly, I respectfully DISSENT from Sections III.B and III.C of the majority opinion.