**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 27 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROY C. JOHNSON; MARK A.
MOORE; DWIGHT E. JACKSON;
STEVEN L. GIBBS; DEBORAH J.
DANIELS-FLEAK; DEBBIE R.
CRISP; DEBRA D. DICKENS;
TAMMARA MCKINNEY-OLDEN;
RUFUS E. NEWSOME; TYRONE D.
LYNN; MARVIN BLADES;
WALTER E. BUSBY, JR.; DERREK
L. LEWIS; RAY D. NELSON;
CORNELIUS D. FINLEY; GARY L.
PITTS; and ALBERT L. YOUNG,

      Plaintiffs-Appellees,

CITY OF TULSA,

      Defendant-Appellee,

   v.

LODGE #93 OF THE FRATERNAL
ORDER OF POLICE,

      Defendant-Intervenor-
Appellant.

No. 03-5086

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CV-94-39-H)**

---

Douglas L. Rogers (James E. Phillips with him on the briefs), Vorys, Sater,
Seymour and Pease LLP, Columbus, Ohio, Scott B. Wood, Wood, Puhl & Wood,

P.L.L.C., Tulsa, Oklahoma, with him on the briefs, for Defendant-Intervenor-Appellant.

Louis W. Bullock (Patricia W. Bullock and Robert Blakemore with him on the briefs), Bullock & Bullock, Tulsa, Oklahoma, Jean Walpole Coulter, Jean Walpole Coulter and Assoc., Inc., Tulsa, Oklahoma, with him on the briefs for Plaintiffs-Appellees, Joel L. Wohlgemuth, Norman, Wohlgemuth, Chandler & Dowdell, Tulsa, Oklahoma, Martha Rupp Carter, Larry V. Simmons, Tulsa City Attorney's Office, Tulsa, Oklahoma, with him on the briefs, for Defendant-Appellee.

---

Before **TACHA** , Chief Circuit Judge,    **McKAY** , Senior Judge  , and **TYMKOVICH** , Circuit Judge.

---

**TYMKOVICH** , Circuit Judge.

---

Union-intervenor, Lodge #93 of the Fraternal Order of Police (FOP), appeals the district court's approval of a consent decree entered between the City of Tulsa, Oklahoma, and African-American members of Tulsa's police department.  The consent decree is the negotiated settlement of plaintiffs' race discrimination action against the City.  Among other things, the consent decree requires the Tulsa Police Department (TPD) to adopt and implement certain race-neutral policies and procedures, and provides for the district court's continuing supervisory authority over its implementation for a period of at least five years.  The decree applies to all Tulsa police officers and is currently binding on all parties.  FOP argues that the consent decree violates its negotiated rights with the City under a collective bargaining agreement (CBA) that has been annually

2

renewed since its inception.

On appeal, we must decide (1) whether entry of the consent decree conflicts either with FOP's rights under the Oklahoma Fire and Police Arbitration Act, Okla. Stat. tit. 11, § 51-101 et seq. (2001), or FOP's collective bargaining agreement with the City of Tulsa, (2) whether FOP is entitled to a trial on the merits of the racial discrimination claim since FOP argues the consent decree adversely affects its legal rights as a third-party intervenor, and (3) whether the consent decree violates principles of federalism. In a comprehensive 122-page order, the district court resolved these three issues in favor of the City and approved the consent decree.

We take jurisdiction pursuant to 28 U.S.C. § 1291 (2000), and affirm the district court's approval of the consent decree.

## I. Background

*A. Original Race Discrimination Suit*

This protracted litigation began in 1994 when plaintiff Roy C. Johnson, an African-American police officer in the Tulsa Police Department, filed a complaint against the City of Tulsa alleging racial discrimination in employment. In 1998, the case was certified as a class action. The plaintiff class consists of all current and future African-American personnel within the TPD, and all former African-American personnel whose employment terminated on or after January

3

14, 1992. As a class, plaintiffs brought claims under 42 U.S.C. § 2000e (2000) (Title VII), and 42 U.S.C. §§ 1983 and 1981 (2000), alleging systematic and long-standing racial discrimination in the TPD in the areas of hiring, promotions, discipline, training, and assignments. Plaintiffs further alleged that they suffered a hostile work environment due, in part, to the TPD's alleged mistreatment of Tulsa's minority citizens. The City denied all allegations of discrimination.

From 1998 to 2001, plaintiffs and the City engaged in a costly litigation battle, conducting over 100 depositions and witness interviews and expending millions of dollars in attorneys' fees. As trial neared, the parties began settlement talks to resolve their differences.

B. *April 2002 Consent Decree and FOP's Intervention*

At the end of 2001, the district court stayed the proceedings in order to facilitate settlement negotiations between the parties. After five months of discussions, plaintiffs and the City filed a proposed consent decree with the district court (April 2002 Decree), signifying the long-awaited settlement of the divisive suit. Tulsa's incoming mayor, William LaFortune, initially stated that he had no objection to the April 2002 Decree, and on April 24, 2002, the court sent a proposed notice of settlement to members of the plaintiff class, TPD officers, and their union, the FOP.

On May 2, 2002, nearly eight and one-half years after the original race

4

discrimination suit was filed, FOP moved to intervene in the litigation. Both the plaintiff class and the City objected.[1] Shortly thereafter, FOP petitioned the court to reject the April 2002 Decree on the grounds that it violated FOP's rights as the "exclusive bargaining agent" for TPD officers and contravened the collective bargaining agreement between FOP and the City.

Holding FOP's motions in abeyance, the district court held fairness hearings on the April 2002 Decree in June and July of 2002. At the hearings, Mayor LaFortune testified that he would have liked more time to decide whether to endorse the consent decree. TPD officers also gave testimony indicating that some within the TPD were not fully committed to implementing the proposed April 2002 Decree. Approximately one month later, in August 2002, Mayor LaFortune and the City formally withdrew their support for the April 2002 Decree. The district court therefore rejected the April 2002 Decree and put the case back on trial track.

*C. The December 2002 Consent Decree*

In September 2002, the district court granted FOP's motion to intervene, finding that the union had claimed a sufficient interest in the litigation and that

---

[1] The City suggested that the FOP be allowed to participate in future settlement conferences but "oppose[d] the FOP's full intervention as a party entitled to participate in all future proceedings, including trial." *See* Order, No. 94-CV-39-H(M), at 7 n.7 (N.D. Okla. May 12, 2003).

those interests would be impaired if the court denied intervention. Approximately two months later, the district court appointed a settlement judge at the parties' request. The parties—with FOP as a full participant—met with the settlement judge on numerous occasions in November 2002. It became clear over the course of these settlement negotiations that an agreement could not be reached with FOP's consent. Therefore, plaintiffs and the City, without the approval of FOP, filed a second proposed consent decree in December 2002 (December 2002 Decree or consent decree), submitting it to the district court in full settlement of plaintiffs' discrimination claims against the City.

The December 2002 Decree required the adoption and implementation of certain race-neutral policies within TPD. Among other things, it required changes in hiring, promotions, specialty assignments, grievance procedures, and officer discipline. In addition, the decree established a Dispute Avoidance and Resolution Committee in the United States District Court for the Northern District of Oklahoma, the primary objectives of which were to (1) collect and review information regarding compliance with the decree, (2) assist the parties in avoiding future litigation, (3) assist the parties in making the changes required by the decree, and (4) address disputes over compliance by acting as an alternative dispute resolution tool.

D. *The Collective Bargaining Agreement*

FOP and the City entered into the CBA at issue in this case in July 2002. The CBA states that its purpose is three-fold: (1) Establish wages, hours, benefits, grievance procedures, and other conditions of employment for TPD's officers; (2) provide for quality law enforcement and policing services for the benefit of Tulsa's citizens; and (3) assist in the amicable adjustment of labor disputes. The CBA also recognizes FOP as TPD's "exclusive bargaining agent" as that term is defined by Oklahoma statute. *See* Okla. Stat. tit. 11, § 51-102(4) (2001).

The City, however, is not required to bargain with FOP regarding matters that are not specifically covered by the terms of the CBA. Article 2 of the CBA, titled "Management Rights and Responsibilities," states that

> [FOP] recognizes the prerogative of Employer [the City] to operate and manage its affairs in all respects and in accordance with its responsibilities, and the powers of authority which Employer has not officially abridged, delegated, granted, or modified by this Agreement are retained by Employer, and all rights, powers, and authority Employer had prior to the signing of this Agreement are retained by Employer and remain exclusively without limitation within the rights of Employer.

CBA, Article 2, § 2.1. The following section, referred to as the "management rights" provision, then specifically lists fourteen broad topics that the City need not bargain over, including matters such as the assignment of working hours, hiring and promotions, the allocation of work assignments, and officer discipline. CBA, Article 2, § 2.2 (b), (c), (d), and (g). The management rights provision also

7

retains for the City the right to determine TPD policy, to "manage the affairs of the Police Department in all respects," and to "introduce new, improved or different methods and techniques of Police Department operation or change existing methods and techniques." *Id.* at subsections (a) and (k).

E. *The District Court's Order*

Shortly after its submission to the district court, FOP filed objections to the December 2002 Decree. FOP claimed that the decree (1) violated Oklahoma labor law by substituting the federal district court for the mandatory arbitration process provided for under the CBA, (2) violated Oklahoma labor law and the CBA by obligating the City to unilaterally adopt and/or change policies which are subjects of mandatory bargaining between employers and police unions, and (3) violated principles of federalism.

In January 2003, the district court held fairness hearings on the December 2002 Decree. FOP participated in the hearings as a full party to the litigation, calling and cross-examining witnesses, and introducing evidence in support of its position. On May 12, 2003, over FOP's objections, the district court approved the consent decree. The district court concluded that the decree was "wise, fair, and fully supported by law" and a "reasonable and equitable" settlement of plaintiffs' claims against the City. *See* Order, No. 94-CV-39-H(M), at 114, 121 (N.D. Okla. May 12, 2003) (District Court Order). In September 2003, this court denied

8

FOP's motion to stay the district court order. The decree is therefore currently binding and in effect against the parties.

## II. Issues and Standard of Review

The union-intervenor, FOP, contends that the district court erred in approving the December 2002 Decree over its objections. In particular, FOP argues that the consent decree (1) violates Oklahoma labor law and the CBA because it prevents the City from bargaining in good faith with FOP regarding issues that fall within FOP's purview as the "exclusive bargaining agent" for TPD members, (2) adversely affects the third-party legal rights of FOP and its members without their consent, and (3) violates principles of federalism. FOP asks that we reverse the district court's entry of the consent decree and remand for a trial on the merits of the plaintiffs' racial discrimination claims. We consider each of these arguments below.

A consent decree is a negotiated agreement that is entered as a judgment of the court. *See Sinclair Oil Corp. v. Scherer,* 7 F.3d 191, 193 (10th Cir. 1993) (citing *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 519 (1986)). "Consent decrees, therefore, have characteristics both of contracts and of final judgments on the merits." *Id.* "The majority rule is, as with a contract, the interpretation of a consent decree is reviewed de novo." *Id.* (citations omitted).

Whether a consent decree conflicts with another written agreement such as a collective bargaining agreement involves a question of contract interpretation that we review de novo. *See United States v. City of Hialeah*, 140 F.3d 968, 973 (11th Cir. 1998) ("It is difficult to envision an issue more purely legal than that of whether one written agreement, the consent decree, conflicts with another written compact, the existing collective bargaining agreement.") (quoting *United States v. City of Miami*, 664 F.2d 435, 451 n.7 (5th Cir. 1981) (en banc) (Gee, J., concurring in part and dissenting in part)). Whether the consent decree affects rights derived from state law is also subject to de novo appellate review. *See Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991). We apply Oklahoma law when making both legal determinations. *See Sinclair Oil Corp.*, 7 F.3d at 194.

Although de novo review applies to questions of contract interpretation, federal appeals courts review a district court's decision to approve a consent decree for abuse of discretion. *See, e.g., City of Miami,* 664 F.2d at 442 ("The district court's approval of a proposed settlement by consent decree should be reversed only if its approval is an abuse of the court's discretion.").

### III.  Whether the Consent Decree Violates FPAA or the CBA

The Oklahoma Fire and Police Arbitration Act (FPAA) makes it unlawful for a municipality to refuse to "bargain collectively or discuss grievances in good

faith with the designated bargaining agent with respect to any issue coming within the purview of this article." Okla. Stat. tit. 11, § 51-102(6a)(5) (2001). The FPAA defines collective bargaining as the mutual obligation of municipalities and union representatives "to confer in good faith with respect to wages, hours and other conditions of employment." Okla. Stat. tit. 11, § 51-102(5) (2001); *see also NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 348–50 (1958) (noting that, in collective bargaining context, matters which relate to wages, hours, and other terms and conditions of employment are considered "mandatory subjects of collective bargaining"). The CBA similarly obligates the City to bargain with FOP "concerning wages, hours, and other terms of conditions of employment."

FOP argues that the district court did not have the authority to approve the December 2002 Decree because the decree conflicts with FOP's collective bargaining rights under Oklahoma law and the CBA. According to FOP, the consent decree prevents the City from bargaining with FOP regarding subjects of mandatory bargaining, including rules of employee conduct, work assignments and promotions, changes in the grievance process, hiring, and other matters regarding the relationship between the TPD and the FOP's members. Stated differently, FOP posits that the consent decree strips FOP of its role as the exclusive bargaining agent for the TPD's employees.

11

Plaintiffs and the City, on the other hand, maintain that implementation of the decree is a legitimate exercise of the City's authority under the "management rights" provision set forth in Article 2 of the CBA.[2]  As discussed above, that provision retains for the City the right to "manage the affairs of the Police Department in all respects" and to "introduce new, improved or different methods

---

[2] Article 2 of the CBA, "Management Rights and Responsibilities," provides in relevant part:

> Section 2.1  [FOP] recognizes the prerogative of Employer [the City] to operate and manage its affairs in all respects and in accordance with its responsibilities, and the powers of authority which Employer has not officially abridged, delegated, granted, or modified by this Agreement are retained by Employer, and all rights, powers, and authority Employer had prior to the signing of the Agreement are retained by Employer and remain exclusively without limitation within the rights of Employer.
>
> Section 2.2  Except as may be limited herein, Employer retains the rights . . . as follows:
>
> (a) To determine Police Department policy including the rights to manage the affairs of the Police Department in all respects;
>
> . . .
>
> (j) To establish and enforce Police Department rules, regulations, and orders;
>
> (k) To introduce new, improved or different methods and techniques of Police Department operation or change existing methods and techniques.

and techniques of Police Department operation or change existing methods and techniques." CBA, Art. 2, § 2.2 (a) and (k).

Thus, whether the consent decree conflicts with state law or the CBA turns on whether the CBA's management rights or other provisions precluded the City from adopting the employment provisions embodied in the consent decree. Oklahoma law applies to our interpretation of the CBA. *See Sinclair Oil Corp. v. Scherer*, 7 F.3d 191, 194 (10th Cir. 1993).

*A. Interpretation Standard*

First, the parties dispute the standard of interpretation applicable to the CBA. Specifically, FOP argues that the district court erred in concluding that the "contract coverage" standard applied to its interpretation of the management rights provision. As articulated in *NLRB v. United States Postal Service*, the contract coverage standard states: "when [an] employer and union bargain about a subject and memorialize that bargain in a collective bargaining agreement, . . . there is no continuous duty to bargain during the term of an agreement with respect to a matter covered by the [CBA]." 8 F.3d 832, 836 (D.C. Cir. 1993) (citations omitted).

In its stead, FOP maintains that the Oklahoma Public Employees Relations

Board (PERB)[3] has adopted the "clear and unmistakable waiver" interpretation standard set forth by the Supreme Court in *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983). *See FOP Lodge 125 v. City of Guymon*, PERB No. 329 (1996), *available at* http://www.ok-perb.state.ok.us. Under that standard, plaintiffs and the City would be required to show specific intent by FOP to waive its right to bargain over each particular subject of the consent decree. We disagree that this is the standard in Oklahoma.

In determining that the contract coverage standard applied in this case, the district court relied on *Fraternal Order of Police, Lodge No. 151 v. City of El Reno*, PERB No. 353 (1998)*, and *Lodge No. 103, Fraternal Order of Police v. City of Ponca City*, PERB No. 349 (1997), *both available at* http://www.ok-perb.state.ok.us. Both of these PERB decisions apply the contract coverage standard. They both state, for example, that parties to a collective bargaining agreement may agree to a management rights provision "which permits the employer to issue policies and make substantive changes concerning terms and conditions of employment during the term of a collective bargaining agreement

---

[3] The PERB, a statutorily created body composed of three members appointed by the Governor, is the entity vested with the power under the FPAA to "adopt, promulgate, amend, or rescind such rules as it deems necessary" and to hold public hearings on "any proposed rule of general applicability designed to implement, interpret, or prescribe policy, procedure or practice requirements under the provisions of [the Act]." Okla. Stat. tit. 11, § 51-104(D) (2001).

14

without requiring bargaining by the employer on such subjects." *City of El Reno* (citing *United States Postal Service,* 8 F.3d 832); *City of Ponca City* (same). Furthermore, "an employer's unilateral change in mandatory subjects of bargaining during the term of a contract is permissible when a management rights clause evidences a grant of permission by the union to unilaterally effect such changes." *City of El Reno* (citing *I.A.F.F. Local 2171 v. City of Del City*, PERB Case No. 194 (1990)); *City of Ponca City* (same).

We agree with the district court that these PERB decisions adopt the contract coverage standard set forth by the D.C. Circuit in *United States Postal Service* and that the standard should be applied here. The authority cited by FOP in its brief on appeal either predates these decisions or is inapposite. Therefore, as did the district court, we apply the contract coverage standard to the terms of the CBA.

*B. Application of the Contract Coverage Standard*

Applying the contract coverage standard of interpretation here, we conclude that the CBA did not bar the City from entering the consent decree without bargaining with FOP, and thus the consent decree does not violate state labor law or the CBA. As the PERB stated in *City of El Reno* and *City of Ponca City*,

> An employer does not violate any duty to bargain when it alters subjects such as the reduction in the number of hours, assignments of employees, or a change in the system of progressive discipline when the management rights clause of the collective bargaining agreement negotiated between the

15

employer and the union gives the employer the right to make, issue and enforce such policies or practices.

*City of El Reno* (citations omitted); *City of Ponca City* (citations omitted).

We find that *City of El Reno* and *City of Ponca City* are directly applicable here. FOP and the City agreed to the CBA's management rights provision. The management rights provision broadly states that the City "retains" the rights to "manage the affairs of the Police Department in all respects," to "establish and enforce Police Department rules, regulations, and orders," and to "introduce new, improved, or different methods and techniques of Police Department operation." CBA, Art. 2, § 2.2 (a), (j) and (k). As the district court found in its comprehensive review of FOP's objections, this broad language plainly encompasses the City's right to enter into a remedial consent decree during the term of the CBA. We are bound to enforce that agreement as written. *See United States Postal Service*, 8 F.3d at 836.

In addition to this broad language, the CBA's management rights clause specifically retains for the City the right to hire, promote, and discipline employees, as well as to allocate and assign work within the TPD. CBA, Art. 2, § 2.2 (c), (d), and (g). We therefore cannot credit FOP's assertion that these topics are subject to mandatory bargaining under the CBA.[4]

---

[4] The only topic covered in the consent decree that arguably falls outside

(continued...)

16

Given our holding that the CBA's management rights provision entitled the City to enter into the December 2002 Decree without impinging on FOP's bargaining rights, the question becomes whether the decree prohibits the City from bargaining in good faith with respect to the terms of *future* collective bargaining agreements. Under the FPAA, collective bargaining agreements are limited to one-year terms. *See* Okla. Stat. tit. 11, § 51-111 (2001). Because the consent decree will be in place for at least five years, FOP argues that the City's position on subjects of mandatory bargaining will be "locked in" when negotiating subsequent collective bargaining agreements. As such, it maintains that the decree violates its statutory right under the FPAA to bargain in good faith with the City on terms and conditions of employment.

Nonetheless, we must reject, as speculative, FOP's argument that the consent decree violates its rights with respect to future collective bargaining agreements. First, although we assume that the consent decree will be taken into account when the parties negotiate future collective bargaining agreements, we cannot know what terms will be on the bargaining table during those negotiations, and, second, whether those terms would be potentially affected by the consent

---

[4](...continued)
the CBA's management rights provision deals with changes in grievance procedures. However, as we discuss *infra* at section IV(A), the Dispute Avoidance and Resolution Committee established by the consent decree does not alter FOP's arbitration rights under the CBA.

17

decree. The question is entirely hypothetical at this time. It is, in fact, more likely that a conflict between the consent decree and CBA will not arise in future negotiations.

The consent decree itself acknowledges the continuing validity of the CBA and states that "all operating directives provided for by this Decree shall be read to be in accordance with language in the CBA." December 2002 Decree, § 1.5. If, however, during collective bargaining negotiations the parties cannot determine whether a proposed provision conflicts with the consent decree, they are free to adopt the provision subject to future interpretation by the signatories to the decree, or to seek guidance from the district court, which retains jurisdiction over the case during the consent decree's term.[5] *See* December 2002 Decree, § 32.1. The consent decree, no more than the management rights provision of the CBA, does not shut down future negotiations on covered topics. Nothing in the FPAA gives FOB the unfettered right to insist on particular terms and conditions of employment, and to then arbitrate the City's failure to acquiesce to those particular terms. In fact, the FPAA itself acknowledges that the obligation to

---

[5] To the extent the December 2002 Decree were to create a future conflict, we note that it is the City, not FOP, that would bear the weight of that conflict. *See W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, 767–70 (1983) (noting the dilemma faced by a company in having to choose between honoring a conciliation agreement and a collective bargaining agreement, but holding that the company "was cornered by its own actions, and it cannot argue now that liability under the collective-bargaining agreement violates public policy").

18

negotiate in good faith does not "compel either party to agree to a proposal or require the making of a concession." Okla. Stat. tit. 11, § 51-102(5) (2001).

As a final matter, the consequences of FOP's view is that bargaining agents that intervene in federal employment discrimination cases would have plenary power to veto all settlements which touch on terms and conditions of employment. Such a result not only neuters the CBA's management rights provision to which FOP agreed, but would also unduly frustrate Congress's preference for achieving Title VII compliance by voluntary means. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974) (cooperation and voluntary compliance were selected as the preferred means for achieving compliance with Title VII); *see also Kirkland v. New York State Dep't of Corr. Servs.*, 711 F.2d 1117, 1126 (2d Cir. 1983) ("[A] rule indiscriminately enabling all intervenors in these cases to veto proposed compromises would seriously hamper efforts to settle Title VII cases, thereby frustrating Congress's expressed preference for achieving Title VII compliance by voluntary means.") (citation omitted). The checks and balances employed by the district court to allow intervention, as well as the court's careful consideration of all of FOP's arguments concerning the application of the CBA and the FPAA, undercut any notion that FOP's collective bargaining rights are unfairly restricted. FOP's argument on this point is therefore unpersuasive.

C. *Additional CBA Provisions*

19

FOP also contends that, even if the contract coverage standard applies, the district court's interpretation of the management rights provision fails to give effect to other provisions of the CBA. In this regard, FOP points out that the management rights provision states that the City retains certain powers "[e]xcept as may be limited herein." CBA, Art. 2, § 2.2. FOP then argues that the CBA's "prevailing rights" clause, CBA, Art. 11, § 11.3, limits the City's power to enter into the consent decree.

In accordance with § 51-111 of the FPAA, the prevailing rights clause provides:

> all rules, regulations, fiscal procedures, working conditions, departmental practices and manner of conducting operation and administration of . . . police departments currently in effect on the effective date of any negotiated agreement shall be deemed part of said agreement unless and except as modified or changed by the specific terms of such agreement.

CBA, Art. 11, § 11.3. FOP interprets this language to mean that if there is no specific agreement in the CBA to change the TPD's existing policies or practices, those policies and practices become part of the agreement, and, accordingly, must be considered mandatory subjects of bargaining. We disagree.

A plain reading of the prevailing rights clause does not mandate that all existing policies and practices are subjects of mandatory bargaining. It merely states that existing policies survive the formation of a CBA unless specifically altered by the new agreement's terms. As explained above, the management

20

rights provision allows the City to make substantive changes in specified areas without first bargaining with the union. Therefore, the CBA's prevailing rights clause and management rights provision do not conflict.

## IV. Whether The Consent Decree Adversely Affects FOP's Rights

The next issue is whether the December 2002 Decree impermissibly alters FOP's contract rights under the CBA. FOP argues that the consent decree "binds" it and imposes legal obligations without its consent, thus entitling FOP to a trial on the merits of plaintiffs' race discrimination claims. Again, we disagree.

*A. The Supreme Court's Decision in Local No. 93*

The Supreme Court's decision in *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986), guides our analysis on this issue. There, as here, the intervening-union challenged the validity of a consent decree between plaintiffs and the city on the grounds that it was entered into without the consent of the union. Finding that the consent decree did not impose any legal duties or obligations on the union, the Court held that a district court was not barred from approving the consent decree over the union's objections. *Id.* at 528–29. The court noted that one party to a case "--whether an original party, a party that was joined later, or an intervenor--[may not] preclude other parties from settling their own disputes and thereby withdrawing from litigation." *Id.* at 529. "[T]hus, while an intervenor is entitled to present evidence and have its objections heard at

21

the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent." *Id.*

At the same time, however, the Court noted that a consent decree may not impose duties or obligations on an intervenor that does not consent to settlement, nor dispose of valid claims the party has under the Constitution, a statute, or contract. *Id.* at 529–30. "[I]f properly raised, these claims remain and may be litigated by the intervenor." *Id.* Thus, a nonconsenting intervenor may block approval of a consent decree only if the decree adversely affects its legal rights or interests. *See United States v. City of Hialeah*, 140 F.3d 968, 975 (11th Cir. 1998) (holding that a consent decree requires the consent of all parties whose legal rights will be affected); *see also United States v. City of Miami*, 664 F.2d 435, 447 (5th Cir. 1981) (en banc) (noting that only a party potentially prejudiced by a decree has a right to a judicial determination on the merits of its objections).

In the present case, FOP has not demonstrated that the December 2002 Decree adversely affects any of its legal rights. As in *Local No. 93*, the consent decree here does not bind FOP to do or not to do anything, nor does it impose any legal obligations on FOP. *Local No. 93*, 478 U.S. at 529–30. Additionally, "only the parties to the decree [i.e., plaintiffs and the City] can be held in contempt of court for failure to comply with its terms," and the consent decree "does not

purport to resolve any claims [FOP] might have under the Fourteenth Amendment." *Id.* at 530 (citations omitted). Thus, under the Supreme Court's reasoning in *Local No. 93*, we find that the consent decree does not impermissibly affect FOP's legal rights.

We nonetheless address FOP's argument that the Dispute Avoidance and Resolution Committee created pursuant to the December 2002 Decree alters FOP's arbitration rights under the CBA. Specifically, FOP contends that the Committee replaces the CBA's arbitration procedures and impermissibly moves dispute resolution from the arbitration forum into the district court.

Section 51-111 of the FPAA requires all collective bargaining agreements between police unions and municipal employers to contain a clause "establishing arbitration procedures for the immediate and speedy resolution and determination of any dispute which may arise involving the interpretation or application of any of the provisions of such agreement or the actions of any of the parties thereunder." Okla. Stat. tit., § 51-111 (2001). The CBA complies with this requirement at Article 7. Section 7.1 of the agreement states: "The [FOP] or any member(s) of the bargaining unit may file a grievance concerning the meaning, interpretation, application, or alleged violation of the terms and provisions of this Agreement." Further, § 7.6 sets forth procedures for the arbitration of any dispute not resolved by the standard grievance process.

Rejecting FOP's argument that the Dispute Avoidance and Resolution Committee infringes on Oklahoma's mandatory arbitration requirement, the district court found as follows:

[I]mplementation of the Committee as provided for in the proposed decree is not intended to, and will not, replace the compulsory arbitration process set forth in the CBA and FPAA. Both the CBA and the FPAA specifically refer to the arbitration of issues under the CBA. In contrast, Section 22.1 of the December 2002 Decree makes it clear that the Committee's responsibilities relate solely to the proposed decree, and not to issues arising under the CBA.

Moreover, contrary to the FOP's assertions and the language in the Plaintiffs' and the City's brief, the Committee to be established under Sections 21 through 24 of the proposed decree will not be "deciding" issues at all. [Rather], the Committee's powers are limited to assisting the parties in reviewing information and discussing issues relevant to the proposed decree in order to avoid future litigation.

Thus, because the Court finds that the Committee created pursuant to the December 2002 Decree will not decide issues regarding interpretation, enforcement, or application of the provisions of the CBA and because nothing prevents the FOP from grieving and arbitrating any valid issues that may arise under the CBA, the Court finds that the December Decree does not substitute the Court for the mandatory arbitration process required by the CBA and the FPAA.

District Court Order at 99–100 (citations omitted).

We agree with the district court's interpretation and conclude that the December 2002 Decree does not adversely affect FOP's arbitration rights under the CBA. As the district court found, FOP retains the right to arbitrate issues arising under the CBA; nothing in the pertinent sections of the December 2002

24

Decree suggests that the Dispute Avoidance and Resolution Committee will infringe upon such right. Thus, the federal district court will not, as FOP maintains, usurp the traditional role of the labor arbitrator.[6] Given these conclusions, FOP's argument that the district court becomes a gatekeeper for union members' grievances and that the consent decree creates an impermissible two-track grievance system must also be rejected.

## B. Trial on the Merits Not Needed

A final question concerning FOP's intervention is whether the union can force a trial on the merits of the race discrimination claims. Relying on *Sanguine, Ltd. v. United States Dep't of Interior*, 798 F.2d 389 (10th Cir. 1986), and *W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757 (1983), FOP argues that its contract rights under the CBA are irrevocably prejudiced without a trial on the merits. In *Sanguine*, we held that because "issues essential to the intervenors were resolved by consent decree and not adversary litigation, [the] case presents a *unique situation* in which prejudice to the intervenors can be avoided only by

---

[6] FOP cites *City of Muskogee v. Martin* for the proposition that "[i]n the presence of any dispute regarding the interpretation of a collective bargaining agreement, the first remedy lies with the contractually-agreed-upon arbitration, and the district court has no authority to disturb the function of arbitration." 796 P.2d 337, 340 (Okla. 1990). However, because we concluded that the December 2002 Decree does not disturb FOP's right to arbitrate issues under the CBA, *City of Muskogee* is inapposite. For the same reasons, we conclude *City of Bethany v. PERB*, 904 P.2d 604, 608 (Okla. 1995), does not require another result.

25

setting aside the prior judgment and allowing the opportunity to litigate the merits of the case." *Id.* at 391 (emphasis added). The case is distinguishable. The intervenor in *Sanguine* was not granted intervenor status prior to entry of the decree and thus was unable to effectively present its objections to the decree. In contrast, here, the district court permitted FOP to intervene prior to settlement negotiations, to file written objections to the consent decree in the district court, and to participate in the fairness hearings as a full party to the litigation. Accordingly, as was the case with the intervening union in *Local No. 93*, FOP was afforded "all the process that [it] was due." *Local No. 93*, 478 U.S. at 529.

The Supreme Court's decision in *W.R. Grace* is similarly unhelpful to FOP. There, the negotiation process leading to a conciliation agreement between the Equal Employment Opportunity Commission and an employer did not include the intervening union. 461 U.S. at 771. Thus, the Supreme Court found that "[a]bsent a judicial determination, the Commission, not to mention the Company, cannot alter the collective-bargaining agreement without the Union's consent." *Id.* (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974)). However, here, we have already determined that the consent decree does not alter FOP's rights under the CBA. Moreover, FOP was included in the negotiation process and given an opportunity to present objections to the district court. Thus, *W.R.*

26

*Grace* is not applicable.[7]

## V. Whether Entry of the Consent Decree Violates Principles of Federalism

FOP's final argument in opposition to the consent decree is based on its reading of federalism principles. Reduced to its essence, FOP contends that the settlement constitutes an impermissible intrusion by the district court into matters of state and local law enforcement because the consent decree (a) inserts the court into the disciplinary process of the TPD, (b) establishes new qualifications for police officers, and (c) diminishes the accountability of state and local officials. As such, FOP argues that the consent decree offends the balance that has been struck between federal-state relations under the Tenth Amendment to the United States Constitution. We review the district court's conclusions on this issue de novo. *City of Wichita v. United States Gypsum Co.*, 72 F.3d 1491, 1495 (10th Cir. 1996).

The Supreme Court has given us guidance on when equitable or structural relief may raise federalism concerns. In *Rizzo v. Goode*, 423 U.S. 362 (1976), plaintiffs brought two class actions under 42 U.S.C. § 1983 against the city of Philadelphia, its mayor, and several city officials. Plaintiffs alleged a pattern of mistreatment by police officers against minority citizens. The district court

---

[7] FOP's reliance on *Martin v. Wilks*, 490 U.S. 755 (1989), is similarly misplaced. Unlike here, in *Wilks* the complaining party never intervened in the underlying lawsuit.

ultimately directed the city to "submit to the District Court for its approval a comprehensive program for improving the handling of citizen complaints alleging police misconduct." *Rizzo*, 423 U.S. at 365. In assessing the scope of the federal court's equitable power, the Supreme Court observed that principles of federalism, "which play such an important part in governing the relationship between federal courts and state governments, . . . have applicability where injunctive relief is sought . . . against those in charge of an executive branch of an agency of state or local governments." *Id.* at 380. The Supreme Court also admonished federal courts granting equitable relief against state actors to be "constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Id.* at 378 (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951)).

Although a federal court's discretion to enter or enforce a consent decree is not identical to a federal court's discretion to fashion an equitable remedy after a finding of liability, the two discretionary acts implicate similar federalism concerns. *See Ragsdale v. Turnock*, 941 F.2d 501, 515 (7th Cir. 1991) (Flaum, J., concurring in part and dissenting in part) ("In entering a consent decree, a district court employs a remedy of the flexibility that has typically characterized equitable relief."). Several courts addressing federalism concerns in the context of consent decrees voluntarily entered by state officials have concluded that the state's

28

consent to the proposed decree obviates or minimizes federalism concerns. *See Labor/Community Strategy Ctr. v. Los Angeles County Metro. Transp. Auth.*, 263 F.3d 1041, 1050 (9th Cir. 2001) (stating that the local agency's consent to a remedial scheme in proposed consent decree relieves many federalism concerns); *Allen v. Alabama State Bd. of Educ.*, 816 F.2d 575, 577 (11th Cir. 1987) ("It is, of course, right for United States Courts to be concerned about the vitality of our federal system; but we disagree that enforcing a settlement made by a state board undercuts important principles of federalism."); *see also Duran v. Carruthers*, 678 F. Supp. 839, 852 (D.N.M. 1988) ("It would be a bizarre perversion of the principle of comity to suggest that a federal court is required, in order to preserve state autonomy, to override the decisions of state officials and substitute its own judgments.").

In contrast, other courts have held that principles of federalism ought to be considered regardless of whether the state actor consents to the proposed decree. *See Kasper v. Board of Election Comm'rs of the City of Chicago*, 814 F.2d 332, 340 (7th Cir. 1987) (observing that, in a state election matter, "the [Election] Board's willingness to transfer its responsibilities to the federal court does not oblige the court to accept"); *Lelsz v. Kavanagh*, 807 F.2d 1243, 1252 (5th Cir. 1987) (vacating consent decree that created "federal court remedy unfounded in federal law [that] intrudes into the governance of matters otherwise presided over

29

by the states"); *Georgevich v. Strauss*, 772 F.2d 1078, 1085 (3d Cir. 1985) (holding that, in light of the district court's legitimate concerns about federal-state relations, court did not abuse its discretion in declining to approve the consent decree); *cf. New York v. United States*, 505 U.S. 144, 181 (1992) (certain portions of federal low-level waste siting statute held unconstitutional even though state officials consented to its enactment).

We agree that overreaching consent decrees, even with governmental blessing, may impermissibly enlist the federal courts into excessive supervision of state government. Here, however, we are forced to conclude that the scope of the decree and the City's consent minimizes such federalism concerns.

Several factors are persuasive in this case. The City, after all, did not ask to be in federal court. It found itself the recipient of a difficult and protracted Title VII lawsuit. After several failed settlement attempts over the course of nine years, the City sought to extract itself from the litigation—both its costs and uncertainties—by agreeing to the December 2002 Decree and the district court's continuing jurisdiction over Title VII compliance. The City was a willing participant in the settlement, and it reaped the benefits of avoiding an expensive and racially divisive trial. Mayor LaFortune testified that he believed the settlement was in the best interests of the City and was a satisfactory conclusion to the highly publicized suit. FOP's federalism argument is therefore

unpersuasive, as City officials not only agreed to the scope of the proposed consent decree, but were actively involved in negotiating its provisions as a party to the case.

Moreover, on its face, the employment terms of the consent decree do not create an unacceptable level of federal intrusion into the day-to-day workings of the police department. Indeed, much of the consent decree evokes a common sense approach to potential liability exposure under federal law. A review of the December 2002 Decree reveals that it is (a) narrowly tailored to address alleged Title VII violations brought by plaintiffs in this case, (b) limited in time, and (c) subject to modification if necessary. We therefore conclude that the consent decree does not excessively intrude into areas of traditional state concern, and, therefore, does not violate principles of federalism.

## VI. Conclusion

For the above reasons, we conclude that the December 2002 Decree does not conflict with Oklahoma labor law or the CBA and that it does not otherwise adversely affect FOP's legal rights. We also conclude that the consent decree does not constitute an impermissible intrusion into matters of state and local law enforcement in violation of federalism principles. Therefore, the district court did not abuse its discretion in approving the December 2002 Decree, and the district court's order is AFFIRMED.

31